**KIT–SAN–AZUSA, J.V., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 91–874C.**

United States Court of Federal Claims.

Jan. 24, 1995.

John S. Riper, Seattle, WA, for plaintiff.

Luis M. Matos, with whom were Asst. Atty. Gen. Frank W. Hunger, David M. Cohen, and Sharon Y. Eubanks, Washington, DC, for defendant. John H. Hockberger, Jr., U.S. Dept. of the Interior, of counsel.

## OPINION

BRUGGINK, Judge.

Trial in this contract action was held in Spokane, Washington between March 7 and March 18, 1994. On April 28, 1994, the court entered an order on liability. It specifically reserved most damage issues for further briefing and argument, although the record on damages was closed. In an unpublished opinion filed November 11, 1994, the court ruled on what it understood to be the outstanding damage issues and directed the parties to attempt to agree on a calculation of the precise amount of the judgment necessary to effectuate the opinion. The parties were unable to reach complete agreement and the remaining issues were briefed and argued. For reasons included in this comprehensive opinion, the court adopts plaintiff's calculation of damage as set forth in its January 11, 1995, status report. This opinion is conclusive of all issues as to both liability and damage. To the extent there is any material inconsistency between this opinion and the order of April 28 or the opinion of November 10, this opinion controls.

Kit San Azusa Joint Venture ("KSA") organized its claims against the Bureau of Reclamation into three general sections: the

Osoyoos Pumping Plant ("OPP") work; the West Osoyoos Tank; and the pipeline loss of efficiency claim. Claims relating to the OPP work, in turn, were divided into Phase I and Phase II. This opinion consists of three parts. Part I deals with liability issues. With respect to those items as to which liability is found against the Government, specific damage issues are resolved in the same discussion. Recoveries allowed are subject, however, to resolution of damage issues common to all recoveries, which are resolved in Part II. Part III resolves remaining matters.

## I. Liability

### A. OPP

#### 1. Differing site condition claim (I–1, II–1, II–2)

Several of the OPP claims hinge on whether the soils encountered constituted a differing site condition. KSA contends that the amount of cobble and boulder it encountered could not have been anticipated from the borings and specifications.

The specifications indicate that much of the building site is composed of Quaternary Glacial Outwash ("Qw"). Paragraph 1.3.13 of the specifications defines Qw to be "generally composed of a heterogenous mixture of silt, sand, gravel, cobbles, and boulders." At subparagraph (6), the specific site geology is described as composed of fill and slope wash overlaying fluviolacustrine deposits, which, in turn, overlay Qw deposits. Fluviolacustrine ("Qf") is defined as "Undivided lake deposits (silt, sand, or clay) and interbedded shoreline accumulations of sand, gravel, and cobbles."

The Bureau took a substantial number of soil borings at the site. They are referred to in the specifications at the same subparagraph. There the contractor is informed that "glacial outwash ... was encountered at the site in all drill holes and consists of a heterogenous mixture of silt, sand, gravel, cobbles and boulders."

The drilling notes bear out this description. The drillers indicate boulder in three of the five sets of notes available. When those notes were translated into the drilling logs furnished to the contractor, however, no reference was made to boulders. What did remain is reference in five of the drilling logs to cobble, or "scattered cobble," as well as other soils.

While the contractor cannot ignore the site description, it is entitled to place greater reliance on boring logs if they are numerous and well spaced, as these were. The specifications' reference to boulder, even at the site-specific level, was due to the general classification type of the soil. The Government places too much emphasis on the general classification of the soil and not enough on what was specifically found, at least insofar as what was shown the contractor in the boring logs. That there were, in a technical sense, boulders in the ground at the site is apparent from the results of excavation at Phase II. Rock of sufficient size to qualify as boulders was definitely present. We will never see what it was that caused problems at Phase I, but the court finds it must have been primarily boulder. This is apparent from the difficulty at several places in both Phase I and Phase II, as well as a few instances of complete refusal, and the condition of the ends of the piles when removed.

The court concludes that to the extent there was boulder, and that the boulders interfered with construction, KSA encountered a differing site condition. To hold to the contrary means that a contractor has to assume from the possibility of boulder in a general type of geologic stratum, that boulder could be encountered at any point, despite the lack of indications in the boring logs. Such an assumption would be nearly impossible to factor into a bid. Richard Galster, a private consulting engineering geologist, testified for the Government that one cannot extrapolate more than a foot from a boring log. Under that approach, the site could have had no boulders, or, according to the Government, it could be virtually solid boulder. Would there be no differing site condition so long as there was no boulder within a few feet of any of the boring holes? Clearly at some point the degree of difficulty due to boulder becomes a differing site condition. That point was reached here.

The question of cobble is admittedly different, because cobble did show up in

some of the boring holes. There was testimony that nested cobble could result in problems similar to those caused by boulders. However, there was also testimony, which the court accepts, that, unless the cobble is closely packed, a vibrating hammer will be able to cause the sheet pile to penetrate. Moreover, the contract drawings and specifications called for use of sheet pile to create a coffer dam. This is a warranty of sorts that sheet pile may be driven without use of extraordinary effort, despite the presence of some cobble.

That plaintiff did in fact encounter substantial difficulties at various points in driving sheet pile is established. It tried extraordinary means to install sheets and to install wells during both Phase I and Phase II. The court concludes that the presence of either boulder or cobble sufficient to impede sheet pile driving constituted a differing site condition.

■ There were other causes for plaintiff's difficulties in sheet pile driving, however. L.B. Foster, Inc., delivered sheet pile late, delivered the wrong sheets, omitted corner sheets, and delivered sheet pile with concrete and dirt in the grooves, warped sheets, and sheets in singles instead of doubles. All of those errors must have affected the production schedule, and some of them affected the efficiency of installation itself. The court finds that ten percent of the additional effort plaintiff claims for sheet pile driving was attributable to other causes for which the Government is not liable. KSA proved additional sheet pile costs in the amount of $40,-782.61. Less ten percent, it is entitled to recover $36,704.35 for this item, adjusted by rulings in Part II.

■ The Government argues, however, that additional deductions should be made for swing shifts and weekend work. Moreover, the Government argues, in light of testimony by Richard Walker, KSA's project manager, that KSA never suffered a 100 percent loss of production, KSA's damages for May 9–17, 1985, should be reduced to zero to reflect failure of proof. The court declines to do so. The fact that KSA was able to minimize delay by use of swing shifts and weekend work does not mean the work is unrecovera-

ble. In addition, the court is satisfied that Walker's method of calculating the sheet pile costs was net of periods of successful initial efforts to drive piling.

■ The court also finds there was a differing site condition with respect to installation of dewatering wells. KSA bid on the assumption it could use a water jet system to install deep dewatering wells. This method was generally successful on Phase I. There was testimony that a modest amount of cobble should not interfere with installation of deep dewatering wells even when using only a jetting system. The water breaks up some material and lifts the smaller chunks to the surface. The largest cobble will travel down with the deepening hole or can be pushed aside. On Phase II, however, KSA had significant problems sinking its dewatering wells. One of the holes had to be moved because even dynamite was inadequate to penetrate the cobble. It became necessary to jerry rig an air lift device with a chopping bit that could be dropped through a sleeve to break up cobble. KSA may recover those costs in excess of the water jetting system. As the court understands Walker's damage calculations, they include only the air lift costs, not the water jetting costs, and thus do not constitute a total cost claim. KSA's total claim for additional dewatering costs is $146,-710.75. This amount is allowed.

## 2. Well-point dewatering system (I–2)

■ The contract directed that excavation had to be "in the dry." Before excavation could begin, the ground had to be dewatered to one meter below the deepest excavation. Before excavation began for the intake, KSA had dewatered to the required level. Walker testified that small amounts of what appeared to be water from surface runoff collected in the excavation point for the intake structure. The excavation itself was relatively shallow in comparison to the general surface elevation inside the coffer dam at Phase I. Walker considered this to be surface water and asked for permission to unwater. Harvey Dickensheets, in charge of the regional Bureau office, denied permission and directed installation of a well-point dewater-

ing system. The well-point system was expensive and cumbersome, and in the court's view neither practically necessary nor compelled by the contract.

The specifications make a distinction between unwatering and dewatering. Unwatering applies to removing surface water; dewatering applies to eliminating ground water. Unwatering can be accomplished using a sump pump. Dewatering must be accomplished with deep wells or a well-point system. Walker testified that in his opinion the water was coming out of "lenses" of sand within the theoretically dewatered soil exposed by the excavation. The Government put on Richard Galster to challenge this theory. He explained that the Qf layer of soil above the Qw layer would dewater more slowly, because it has more fines. There were also testimony and documentary proof that what the government inspectors were really concerned about was water visibly leaking through the sheet piles. This must have been leakage above ground level, or it would not have been visible. A report by inspector Joe Perry on February 21, 1985, reflects a concern with surface runoff into the excavation. He testified that the contractor was told that the water would have to be "intercepted outside of the excavation." That language suggests that the water is coming into the site, rather than up from the excavation, as one would expect from poor dewatering. This is confirmed by Walker's testimony that there was often insufficient ground water to keep the well-point system operating.

The court finds that the problem was surface water, and that KSA should not have been instructed to install a well-point dewatering system. KSA is therefore entitled to recover the costs of installing and operating a well-point system. KSA's claim for the well-point system is $53,979.67.

The Government urges a deduction of $2,544 for the "Okanogan Security System" as unsubstantiated. The court makes the following observation concerning this cost item, as well as other similar items, such as bonding costs. See Part II.E., *infra.* An audit was conducted of the claim. That audit was not introduced at trial, although one of the Government's auditors was listed as a witness and sat through the trial without testifying. After the audit, but before trial, the court frequently was asked to become involved in disputes concerning discovery, particularly discovery by the Government of KSA's accounting records. The task was complicated to some extent by KSA's bankruptcy and by the fact that there were voluminous records, many in storage and not immediately accessible. The court is satisfied that eventually the Government had full access to the records it needed, both during the audit and during pretrial.

■ Prior to trial, the Government objected to the summary form of plaintiff's damage calculations. Because of the many individual elements of the claim and the large volume of records that would have to be produced if all costs had to be documented at trial, the court permitted plaintiff to use a summary exhibit for damages, assuming that, on a sample basis, their accuracy could be proven at trial. At trial, plaintiff had extracted the documentation to prove key pieces of its summary damage exhibit on a sample basis. Plaintiff Exhibit ("Px") B–110. Those materials were available at trial. After hearing Walker explain his methodology in preparing the exhibit, and after examining the original materials, the court admitted the summary. Defendant chose to attack many elements of Walker's damage calculations, as well as those of Michael Myette, plaintiff's expert on engineering design and efficiency. It would be highly prejudicial to plaintiff, however, to permit the Government, after trial, to highlight pieces of the damage calculation that were not individually supported, unless KSA had been put on notice at trial that it would have to support them. Accordingly, no deduction is made with respect to security costs. The court is satisfied they were incurred, and Walker's sponsorship of KSA's unified damages exhibit, Px B–110, is sufficient evidence the cost was necessary.

### 3. *Twisted H-piles (I–3)*

Claim I–3 asks for two types of costs. One is for over-excavation at the intake structure. During closing argument, counsel for KSA stated that the contractor could not confirm

whether this part of the claim was paid. It may have been. Without better assurance, the court will not consider that part of the claim.

The other part of the claim, for twisted H-piles, fails for a different reason. The specifications warned the contractor that it might have to pre-drill holes for the H-pile beams supporting the intake structure. ¶ 3.1.2. KSA did not do so. It ended up with crooked H-piles and extra expense for a larger concrete pad. There was no evidence that H-piles, unlike sheet pile, could be vibrated through cobble. It is the court's understanding that the H-piles were impact driven. Moreover, the boring hole closest to the intake structure, number 267, showed nearly thirty feet of cobble mixed in sand and gravel. The drilling was described as "hard to very hard" in places. Not having tried pre-drilling, KSA cannot establish a differing site condition.

4. *Differing Site Condition—Pipe Excavation (I–4); DSC Pumping Plant excavation—unsuitable materials (II–9)*

These claims fail for lack of proof. As to Phase I, Walker testified that excavation for the pipelines was impeded by unexpected dewatering problems. He attributed this to the presence of too much silt and clay and clayey sand, generally impervious materials that are slower to dewater. For the purpose of this ruling, the court assumes that KSA had problems with dewatering due to the soils. The court does not find, however, that there was a differing site condition.

The boring hole closest to the pipeline excavation, DH 101, showed an almost continuous zone of impervious or impervious-mixed soils at the higher elevations, where excavation would take place. There were zones of solid silt, silty gravel, silty sand, clayey sand, and clayey silt. The specifications also warned the contractor that "fine-grained components of the fluviolacustrine deposits will prevent rapid removal of water from this unit by dewatering systems solely dependent on gravity dewatering methods." The court finds that this information was sufficient to put KSA on notice of potential dewatering problems.

The contractor also seeks compensation for removal of unsuitable material contaminated by vegetative matter. However, boring holes DH 1, 2, 4, 141, and 266 all show organic silts. Holes 266 and 141 are in the excavation site itself. The court finds that the contractor should have anticipated that it would have been unable to compact this material.

5. *Overexcavation at Phase I, the "blister" (I–5)*

Walker testified, and photographs bear out, that the contractor encountered highly plastic soil while compacting for the pipeline foundation in Phase I. The contractor was directed to remove the soil and replace it. At closing argument, the Government agreed that it should pay for the removal of the unsuitable material, but it contends that KSA should be paid at the contract rate. The relevant contract provision, ¶ 4.2.5 states that if the Contracting Officer ("CO") directs the removal of unsuitable material, its removal and replacement should be paid for at the contract rate. KSA contends that this provision contemplates identification of unsuitable material before a substantial amount of time has been spent working the material. Here, KSA had worked the stretch involved, and only after the material had been compacted and covered with fiber sheeting, and driven over a great deal, did it become apparent that the material was not useable.

The court agrees with plaintiff. KSA would not be fully compensated if the contract rate was simply applied to the cubic yardage involved. The contractor may recover its actual costs in the amount of $4314.87.

6. *Additional rip-rap at intake (I–6)*

KSA claims that the additional rip-rap it was instructed to place around the intake structure is a change order. It is not. The drawings require the contractor to "replace to original ground surface or mound accordingly to maintain cover required." In KSA's Supplemental Memorandum, it argues that the earlier order on liability improperly

failed to reach the issue of additional costs it incurred because KSA could not use heavy machinery to install the rip-rap as planned; instead it had to install the rip-rap with light equipment or by hand. KSA's proof of claim I–6 failed to segregate those costs claimed because of additional rip-rap from those caused by the interference generated by the well-point system. Both parts of claim I–6 fail.

### 7. *Failure of the Tie-back anchoring system (II–3)*

 KSA hired Kramer Gehlan Associates ("KG") to design a shoring system for the sheet piling at Phase II. KG selected a helical anchoring system designed and manufactured by the A.B. Chance Company. One of the north wall tie-back anchors was exposed to a tension load equal to 150 percent of the design working load. The anchor failed. More helical plates were added to another anchor, and it failed as well. KSA and KG came up with a totally different system using concrete deadmen. KSA argues that the soils were different than shown in the borings, and that, but for those differences, the original design would have worked.

With very little testimonial support, KSA asks that the court's findings regarding a differing site condition concerning boulders and cobble be considered the cause of the failure of the anchor system. No direct causation evidence exists. KSA's argument amounts to the assertion of *res ipsa loquitur*.

The Government strongly challenged the quality of KG's design. Gordon Greene, who has a doctorate in soils mechanics,[1] testified. He analyzed the A.B. Chance letter evaluating the failure and showed the shortcomings in its analysis. He testified that the Chance design was deficient in at least four respects. First, it made use of only four of the six relevant drill holes. One of the excluded holes had the most comprehensive standard penetration test data. Second, the design did not eliminate the extremes of the blow count information. Third, the calculations Greene had access to suggested a confusion

of ultimate load and working load, leading to unrealistic expectations. Finally, and most critically, the designer extrapolated from fifty blow counts in 4″ to 100 blow counts in 12″, even though the drawings specifically warn the users of the data not to extrapolate. In his report, Greene states that an upper value of fifty is all that is realistic in glacial soils. This extrapolation gave a false impression of material better suited to holding a load.

In addition, the notes accompanying the A.B. Chance letter state that if conditions generally at the site are similar to those reflected in boring DH–100, they would "pose installation problems." Boring DH–100 reflects, among other things, cobble, poorly graded sand, and silt. There is no reason to assume the addition of some boulders would have pushed the anchor tie-back system into failure, when the designer recognized up front that the type of soils advertised in the drawings would cause problems. The court finds that the anchor system failed for reasons other than a differing site condition.

### 8. *Unanticipated export/import of fill material (II–4)*

 KSA stockpiled the material it excavated while it was preparing the pumping plant site. Walker explained that the contractor planned to use this material for backfilling and compaction as construction progressed. He also explained that the original plan was that the material could be placed without being reworked. The specifications did not permit the placement of cobble, however, and KSA ultimately had to screen the stockpile for cobble, some of which was then broken up. In addition, KSA imported suitable material from offsite. It now seeks the additional costs of screening and importation of off-site fill.

KSA never justified the reasonableness of its underlying assumption that it would be able to replace the excavated material. Five of the boring logs show cobble. Because cobble in any quantity was unacceptable as backfill, the contractor should have reckoned up front with the need for screening or im-

---

1. While Greene had not used an A.B. Chance helical design before, that is not due to inexperi- ence on his part. Rather, it reflects the relatively novel nature of the design.

portation of fresh material. It matters not that some of the boring logs did not indicate the presence of cobble. Because some of the logs indicated cobble, an unquantified amount of cobble was foreseeable. The difficulty in predicting the precise amount of cobble in the soil should have warned KSA of the possibility that the soil would not be suitable for backfill. In any event, the soil, for purposes of this claim, was not sufficiently different from that indicated by the boring logs to constitute a differing site condition. KSA may not recover the costs of screening or of importing fill.

9. *Cold weather protection and loss of efficiency (II–5)*

■ KSA anticipated initially that it would be finished with the major concrete work in Phase II well before the winter of 1985–86. The concrete structure would have been poured and cured by the middle of September 1985 and would have required only minor weatherizing. Instead, work on the pump plant began three months late, in August, and was only partially complete when suspended on December 20, 1985. The foundation and wing walls were in place, and a short stretch of the manifold was encased in concrete. Significant efforts were required even to get that much accomplished. A temporary structure was built over the plant, and pipes and thermal blankets were used to keep soil from freezing. KSA personnel exerted a great deal of energy in coping with the cold just to keep some work going forward. Walker testified that he calculated a thirty-five percent loss of efficiency, and the court accepts that.

KSA cannot recover on its claim, however, because it has not proven its underlying premise that, but for the differing site condition and other government-caused delays, the work would have been completed on schedule. Jack Miller, KSA's safety engineer, put together Px C–2, a chart reflecting KSA's delay claim. It attributes to the Bureau a total of 115 days of delay prior to the winter shutdown. The largest single period of delay, seventy-five days, is attributable to the failure and redesign of the anchor system. That period is more than coextensive with the sixty-seven day period attributable to subsurface obstructions during installation of dewatering wells on Phase II. The court has found that the anchor tie-in system failure cannot be attributed to the Bureau. It follows that any Bureau-caused delays during that seventy-five day period cannot have been the sole cause for holding up work.

Finally, KSA must cope with the fact that its managerial personnel have on numerous occasions and under oath, blamed various suppliers and its first project manager for most of its problems, including problems that occurred during the period in question. The court has found that some of the delay associated with installing sheet piling cannot be attributed to the Bureau. In addition, in 1989, Walker blamed Tonasket Ready Mix for causing the entire winter delay due to failure to deliver concrete on time. Even discounting for a degree of uncertainty and preventive pleading, it is plain that KSA places a significant amount of the blame for delay in the 1985 time frame on Tonasket.

In sum, KSA has not established that the Government caused the loss of three months of production prior to August 1985, and the evidence suggests that other causes, attributable to KSA or its suppliers and subcontractors, were independently responsible for more than three months' delay. The winter delay and costs claim fails.

10. *Settlement at the Osoyoos Pump Plant (II–6, II–7, II–8)*

■ Most of the support walls were in place and backfill had been placed around the foundation, pillars, and wing walls before the winter shutdown. Only the narrow, tapered end of the manifold had been encased in concrete, however. About half was not directly supported by concrete. The manifold weighs twelve and one-half tons. At the south end, where it protruded more than twenty-five feet over the wall, the manifold was supported on a single I-beam, propped directly on the soil. The manifold was connected by the ODL coupler to the main pipeline going to the distribution system. This juncture was not intended to give any support, however. It was supposed to keep the metal ends of the pipes away from each

other. The main body of the manifold was also wired down onto the wing walls at several places.

KSA opened the site in early March, 1986. One of the first things it did was to pour more concrete around the manifold, completing the encasement of about half the manifold. One week later, it used a heavy vibrator to remove the sheet piles. Part of this removal occurred in the immediate vicinity of the point at which the manifold rested on the I-beam. Shortly after removal of the sheet piling, KSA noticed that cracks had developed in some of the wing walls. A series of surveys of the slab and manifold were put into evidence. The contractor argues from its surveys that the slab settled dramatically over the winter due to soil problems. The overall settlement was a relatively uniform two inches. In addition, the ODL flex coupler was showing signs of stress. It later developed that the manifold was out of alignment, and the flanges on the distribution pipes had to be rewelded. On May 5, 1986, KSA notified the Bureau that it would cease work at the OPP until the Bureau proposed a solution. The Bureau acknowledged some settlement but contended the settlement was due to poor construction practices. KSA began working again on May 22.

KSA's claim seeks reimbursement for: the costs of monitoring the slab for signs of settlement; the costs and delays attendant upon fixing the ODL coupler; and the costs of fixing the alignment problem.

The court is not persuaded that the Government either caused or assumed the risk for any of the settlement problems. The evidence KSA submitted with respect to the change in elevations over the winter is equivocal at best and was undercut substantially by Lynn Isaacson. Yet, even taking plaintiff's view of the survey evidence, it is less than clear how that evidence supports its direct costs claim. There is no evidence that the Government's design was defective, nor is there any proof that the soils were of such a nature that they could not be properly compacted. The court is unwilling to find, from the mere fact of settlement, that settlement problems were due to factors for which the Government was responsible. The most damaging movement occurred with respect to the manifold, and the court finds that Isaacson cast doubt on the effectiveness of the supports KSA improvised over the winter to keep the manifold from moving. KSA's argument is fundamentally *post hoc ergo propter hoc.* After considering Isaacson's challenges to the survey data and to his alternative explanations for cracking and movement, the court finds that the direct costs claim fails for insufficient proof. In view of the court's subsequent finding that the Government's delay in furnishing a fix for the Similkameen tie-in extends the contract completion date, it is unnecessary to determine whether the Bureau delayed in giving direction to KSA to make the ODL repair.

■ In its Supplemental Memorandum, KSA asserts that the Government designed the OPP structure, the excavation, and the foundation, and that KSA performed the work according to the Government's design. KSA argues that the law establishes a warranty that the contractor's work under those circumstances will be suitable absent defective workmanship, which was not shown here. KSA presented evidence of correct construction, and the Government presented no evidence of defective construction. Thus, proceeds the argument, KSA is entitled to recover its costs in making the plant conform to the specifications and to producing a suitable result. Plaintiff's argument is self-defeating. Although it is true that the law imposes an implied warranty that construction according to contract specifications will produce a satisfactory result, plaintiff here does not argue that it was required to deviate from the specifications to produce a satisfactory result. Rather, plaintiff argues that it needed to perform extra work to bring the pumping plant into conformity with the specifications. A contractor is not entitled to additional compensation simply because it encounters unforeseen difficulties. It has no right to complain if the structure it ultimately constructed was essentially the same as the one it contracted to construct. *United States v. Spearin,* 248 U.S. 132, 136–38, 39 S.Ct. 59, 61–62, 63 L.Ed. 166 (1918); *Hol–Gar Mfg. Corp. v. United States,* 175 Ct.Cl.

518, 525–26, 360 F.2d 634, 638 (1966); *Servidone Constr. Corp. v. United States*, 19 Cl.Ct. 346, 376–77 (1990). If the specifications were defective, KSA might have had a claim for costs incurred in attempting to achieve conformity. *See Hol–Gar Mfg. Corp.*, 360 F.2d 634, 175 Ct.Cl. at 523–24. KSA has not shown, however, that the specifications were defective and is therefore not entitled to recover on that theory. Furthermore, any harm to the structure that occurred over the winter was precipitated by delay on the project that we have found at least partly attributable to KSA. *See supra* Part I.A.9.

In its supplemental memorandum, KSA also claims extended costs for maintaining the sheet pile and dewatering systems during the additional periods of use attributable to the differing site condition and also for maintaining them over the 1985–86 winter. In Part I.A.9., we held that the Government was not responsible for cold weather loss of efficiency for the 1985–86 winter. The same rationale—that sufficient periods of concurrent delay existed to push work into the winter—defeats KSA's extended costs claim as well. KSA's costs for those periods when it was actually doing extra work on sheet pile driving and dewatering are includable in the damages awarded under claims I–1, II–1, II–2, and I–2.

## B. *West Osoyoos Tank*

■■■ KSA contends that the contract indications of the subsurface conditions at the West Osoyoos Tank lead it reasonably to believe that excavation would be in relatively solid rock. It contends that the additional expenses it incurred in cleaning up overexcavation and filling with concrete were due to a series of major fissures well below the surface that constitute a differing site condition.

One boring hole, DH–260, reflected the type of rock to be removed at the tank site. This log was analyzed for KSA in 1985 by Stan Kelsay of Geotechnical Resources, Inc. He testified, as did John Koloski, an engineering geologist called as an expert witness by KSA. The same data was analyzed for the Government by Richard Galster. The court also had the benefit of the physical core sample itself, along with daily reports, the blasting plans, and photographs. After considering this evidence and testimony, the court concludes there was a Type I differing site condition. Subsurface conditions were not as indicated.

The hardness of the rock reflected in the borings is deceptive. To the extent it was solid, the rock was indeed hard. The photographs of the bore holes for the charges show that the upper face held up well after the blast. While DH–260 indicates many joints in the rock, Koloski testified that this is consistent with the type of stress jointing virtually all rock experiences. The boring showed a 100 percent recovery of rock down to approximately thirty feet. The Bureau design also showed a relatively steep ¼ to 1 slope. This is consistent with an assumption of competent rock. It is inconsistent with the sort of gaps, clay, and fines KSA actually experienced as it got to the middle of the slope. The photographs plainly depict two major discontinuities in the rock that could account for the fracturing, overexcavation, and loss of focus in blasting that occurred. These are not the type of joints reflected in DH–260. As Galster testified, what KSA experienced was a small fault that had become filled with water-born clay and fines. Although Galster's report reflects that he did not analyze the appropriateness of the blasting operation, he suggests that the contractor used poor blasting practices. Two indicia of poor blasting are excessive fly rock and overexcavation. These are also indicators of the problem with rock itself. According to Koloski, the competence of the drilling and blasting is reflected in the neat way the exposed drilling holes stood out at the top of the slope.

After the second and third blasts, KSA had to do substantially more mucking and scaling than it had anticipated. The result was that some areas were overexcavated and others had to be drilled and shot a second time. The weakness of the rock at the anticipated foundation lead to more mucking and an order to fill with concrete. The court concludes that KSA is entitled to be paid for the extra expense involved in overexcavating and filling with concrete, including the extra ex-

cavation for the manifold. The court rejects the claim for increased painting costs. The documentary record suggests that the refusal of Maltby Tank & Barge to paint the tank, which resulted in higher procurement costs, was not a direct result of the differing site condition. KSA claims damages of $103,-988.96. After deducting the painting costs, the claim totals $89,531.94. The Government argues that additional deductions are required for the period from June 6, 1985 to June 28 or July 9, 1985, because the differing site condition did not affect KSA's work until one of the latter two dates. The differing site condition was manifested as early as April, however. This period is not excluded.

The Government also contends that KSA is due costs of manifold excavation for only one day, October 1, 1985, rather than three days as claimed. This argument misconceives the nature of the claim, however. The plaintiff is entitled to be paid for removing the manifold, pulling out the sand, and replacing the manifold, not just for concreting it in. All this was extra work, and it occurred on all three days.

There was sufficient proof of the necessity of the concrete claimed and the use of rebar. The court allows $89,531.94 for those expenses.

C. *The pipeline efficiency claim*

██ KSA originally anticipated meeting the schedule for installation of the buried pipeline distribution system by use of three construction crews, each one having a different geographic responsibility. The order of work was the same throughout, however. The pipe was ordered by KSA to government design with great specificity. KSA ordered pipe from five principal suppliers: Ameron, Fairman, ITT–Grinell, Ames, and Pacific Waterworks. KSA alleges its expenses ran nearly two million dollars over what it anticipated, as reflected in its bid. Of this, it asserts that government-caused design changes, improper testing, and improper application of the contract's right-of-way requirements caused an impact on KSA's ability to efficiently prosecute the work.

The court finds three phenomena were primarily responsible for disrupting the order and efficiency of the anticipated work. The court is persuaded that by far the most devastating was the virtually complete collapse in supplier responsiveness. The best evidence of this is the plaintiff's own continuous, comprehensive attacks on its suppliers in litigation. Although KSA attempted to discount the importance of its litigation allegations, as in the case of problems it had with suppliers on Phases I and II, it cannot escape the general effect of its earlier claims.

The second phenomenon was the large number of changes in design initiated by either the Government or KSA due to misfits of pipes or connections in the field. KSA was paid over $350,000 for modifications to the pipeline distribution system. Although the Government questioned the quantification of the design changes, the court is satisfied that the number was dramatic and exceeded what the contractor reasonably should have expected. The documentation behind the efforts of William Organ, a Bureau supervisory civil engineer, to minimize the design changes did not stand up during cross-examination. The number was sufficiently great that, given the need for coordinated work scheduling, it undoubtedly impacted on the efficient prosecution of the work. The effort to show that KSA waived any further claims arising out of the design changes failed for lack of direct evidence. Out of all those modifications, the court would expect to find first-hand evidence of at least one waiver. The effort to connect the force accounts, design changes, and modification numbers was too tenuous for the court to accept. Nor could it support the Government's argument that the contractor should have isolated the impact on a modification-by-modification basis.

A third source of inefficiency is KSA itself—its own mistakes and the impact of the removal of equipment by Robert Krueger, KSA's first project manager. As Walker testified, KSA was a "major player" in its own problems on the pipeline claim. Numerous references to these problems were captured from the work records by William Organ.

KSA failed to offer sufficient proof that its efficiency was hurt by problems with the right of way and by improper Government testing. There may have been a few instances in which the contractor was given an unrealistic amount of room in which to operate, but the court is persuaded there was no general scheme to shift to KSA what would otherwise be the Government's cost of paying for lost or damaged trees. The specifications warned at ¶ 1.3.8 that the contractor would have to work around obstructions in the right of way in order to minimize damage. It was possible to determine where the right of way impacted trees by comparing the right of way shown on the drawings with the stakes on the ground.

With respect to testing, the court is satisfied that the Bureau's methodologies were less than ideal. It is likely true that there was insufficient compaction testing and that the Bureau measured moisture content after the relevant time period. There were most likely instances in which too much work was redone due to a single failure. The evidence as to improper calibration is not as convincing. It is possible that the sand was calibrated frequently enough, and that discrepancies relate to calibration of different machines. The scope of the problem is far from clear, however. Koloski would not testify that inadequate testing was general to the whole project, and some of his exhibits were partially discredited. The court concludes that testing problems had only a minor effect on the efficiency of KSA's work.

The court is persuaded that there is no meaningful or accurate way to extract from KSA's actual costs the impact of government-caused delay. The court was not at all convinced by George Strickler's suggestion that a measured mile analysis was possible. The impact of the changes could not be captured by comparing the time and effort involved in laying a "normal" stretch of pipeline with that of laying an impacted stretch. That would not capture the wasted motion and peripheral activities and duplications beyond simply installing pipeline. Tracking the damages through a force account would reflect nothing other than easy-to-identify direct costs.

In sum, the court finds that the modifications, redesigns, and, to a small extent inadequate testing did impede the efficiency of the work, but to a lesser degree than claimed by KSA. The problems caused by the Government are minor in comparison with the problems caused by suppliers and KSA's internal difficulties and inefficiencies. The court concludes that, to the extent KSA's reasonable and provable costs exceeded its bid for pipeline work,[2] KSA is entitled to twenty percent from the Government.

KSA's efficiency loss calculations were presented by Myette. He began by determining total equipment costs for the project and total labor costs for the pipeline work. Because equipment costs could not be directly broken out as between pipeline and non-pipeline work, he estimated a percentage of equipment costs allocable to pipeline work. He did this by examining equipment costs for two months of the project that he deemed were representative of the relative amount of work devoted to pipeline and non-pipeline activities. Pipeline costs were fifty-seven percent of the total for those two months. This is the percentage Myette applied to the total project equipment costs. He then calculated total costs on the project, deducted payments and modifications, and concluded that the loss was $1,822,460. Twenty percent of this figure is $364,492.

The Government challenges Myette's use of fifty-seven percent as representative of KSA's actual experience of pipeline equipment costs. It argues that a disproportionate degree of pipeline work occurred during those two months. It contends that if the study had included the entire project period, the percentage of pipeline work would have been lower. The Government proposes instead that the court rely on Daniel Harper, KSA's accountant, who estimated KSA's pipeline cost overrun as $1,357,848, less $350,078 for paid modifications, which equals $1,007,770. Twenty percent of that figure is $201,554.

2. The court rejects defendant's challenges to the reasonableness of KSA's bid for pipeline work.

Plaintiff argues against the use of Harper's figures for two reasons. First, his percentage is derived from labor costs, not equipment costs. Second, his calculations do not include equipment costs for 1987 or overhead. While the first objection is accurate, it does not mean that the calculation is not reasonable. Harper himself felt it was an appropriate method of estimating pipeline equipment costs. The second objection is also not telling. Myette's damages exhibit also purports to limit equipment expenses to 1985 and 1986. Moreover, Harper testified that he included all equipment expenses. Finally, Harper's figures could be adjusted to include overhead. The court finds that Harper's calculations, while not presented as a claim for lost efficiency costs, are some evidence of that loss. It finds that those calculations should be used to modify the percentage of equipment cost attributable to pipeline work. Myette, using two months out of two years of equipment costs, came up with an allocation of fifty-seven percent. Harper, using all or virtually all labor costs, came up with an allocation of forty-four percent. The court finds that a more accurate estimate is fifty percent. Accordingly, in calculating pipeline loss of efficiency, the court will use that figure for the percentage of equipment allocated to pipeline work.

The Government also argues that some of the costs included in KSA's loss-of-efficiency claim duplicate direct costs that the parties have settled in the amount of $208,625. Counsel for KSA conceded at oral argument that if KSA were reimbursed for the entire $1.8 million "loss" testified to by Myette, it would receive a double recovery. This has to be the case, because the loss-of-efficiency claim represents additional direct costs in excess of contract payments for both labor and equipment. These settlements should be included, therefore, in the amount deducted as "payments" from the total loss figure.

The court has considered defendant's other arguments respecting the efficiency claim and rejects them.

## II. Remaining Damage Issues

Defendant contends that certain deficiencies are common to more than one element of KSA's recoveries.

### A. *Equipment rates*

Plaintiff's equipment rates are expressed in Px O, a compilation of data that attempts to support figures based on actual expenses, as reflected primarily in invoices. In its post-trial briefing, the Government does not challenge the principle of pricing based on actual costs but isolates the charges for some of the equipment as being improper. Specifically, it questions the fact that the plaintiff is claiming equipment costs against the Government that are higher per item of equipment than those claimed against a subcontractor, L.B. Foster, in related litigation. KSA at one point was pursuing a claim against Foster, which furnished much of the sheet piling. In that claim, KSA charged a P & H 670 Crane and a vibratory hammer at hourly rates of $42.41 and $51.57 respectively. In its claim in this court, it seeks hourly rates of $75 and $55 respectively. This pattern continues as between the two claims. The court can discern in the claim against Foster no reason that costs charged for the same equipment should be less than those sought here. After the Government established this discrepancy, the burden shifted to KSA to explain it. KSA never attempted to do so. The suggestion that, overall, plaintiff's equipment rates compare favorably with substituting "Dataquest" rates is off the mark. As defendant correctly points out, KSA has the burden of proving its costs. *Lisbon Contractors, Inc. v. United States,* 828 F.2d 759, 767 (Fed.Cir.1987); *North Slope Technical, Ltd. v. United States,* 14 Cl.Ct. 242, 267 (1988). There is a presumption that actual costs paid are reasonable. *Bryce Constr. Co. v. United States,* 163 Ct.Cl. 97, 103, 324 F.2d 516, 519 (1963); *North Slope,* 14 Cl.Ct. at 267. KSA has offered to claim its actual rates, but in specific instances it is unable to explain why it would seek to recover less money for the same equipment for the same hours from Foster. Accordingly, the court agrees with defendant that costs must be refigured by substituting rates claimed against Foster if they are lower than actual equipment rates asserted here.

The court declines to adjust equipment rates further than reflected in plaintiff's Jan-

uary 11, 1995 status report with respect to whether they accurately reflect rates charged to L.B. Foster. Actual rates are presumptively correct. Defendant has the burden of showing that they were not used. As to the compressor, plaintiff's billings do not conflict with rates charged Foster. As to the welder, there is insufficient proof of a conflict as to the same piece of equipment.

### B. *Small tool costs*

■ In its post-trial brief on damages, the Government raises for the first time the contention that, by contract, small tool costs were to be priced as a percentage of direct labor. It attaches to its brief an analysis done after trial which purports to identify small tool costs and reprice them according to the contract. The only example included in the brief is a single acetylene torch. While the Government may have had a legitimate point, it is too late to raise it now. Because the attachment was not offered at trial, it cannot be the subject of examination or refutation by plaintiff. The court has no independent way to parse the documents to determine which costs are attributable to small tools.[3] Accordingly, it declines to order the recalculation of damages to comport with the Government's analysis in that regard.

### C. *Idle time*

■ The Government argues that KSA is charging full equipment rates for time when machinery was idle, in violation of SGP 48(c), which states that idle time is charged at half of regular operating expense. Defendant points to daily inspection reports showing certain equipment as idle on days for which KSA is charging more hours of ownership and operating costs for that equipment than remain for active time. Walker was asked about that phenomenon and explained that in calculating equipment costs, he did not necessarily treat a piece of equipment as idle with respect to SGP 48(c) simply because the daily inspection sheets showed it to be idle. As he explained it, a piece of equipment might be unproductive, but would still have

to be at the current work location under the control of a worker. He testified that in compiling damage calculations he charged for equipment only when there was actually an operator assigned to it.

The contract does not define what is meant by "idle time." The court does not need to speculate, however, as to whether the equipment was idle. The daily inspection reports show that it was. Walker did not testify that the equipment was not idle. He merely drew a distinction between certain degrees of idleness. This is not a distinction drawn from the contract. While equipment in a standby position with an operator may generate more expense than a piece of equipment with no labor associated, labor charges are a separate cost item. What presumably lead the foremen or inspectors to characterize equipment as idle is that it was not operating. There is no question that idle equipment generates less expense than a piece of equipment that is operating. Because the contract called for a different billing regimen for idle equipment, KSA's allowed costs must be calculated with idle time at half the charge of operating equipment.

With respect to weekend idle time, the court agrees with plaintiff's construction of SP 48(c). Idle time is recoverable at fifty percent of the normal rate on those weekend days on which work was actually performed. Mr. Walker's evidence, as captured in Px B–110, and as corrected in plaintiff's January 11 status report, is limited to such hours.

The court also accepts the figures captured in Px B–110, as adjusted in light of the earlier opinion, as a correct reflection of idle time. Defendant's alternative calculation is less reliable. The court declines to reopen the record for additional evidence.

Finally, the court rejects defendant's argument that Daniel Harper's equipment expense calculation should be adjusted to reflect idle time. Mr. Harper purported to calculate actual expenses for himself, not utilizing Mr. Walker's figures. Moreover, only a small number of pieces of equipment were based on anything other than actual rates.

---

**3.** The court notes, moreover, that clause 48 of the supplemental general provisions provides a percentage determination in lieu of actual costs only when the modification is less than $100,000.

To apply a thirty-seven percent idle time adjustment to all the direct costs would be a substantial over-correction, if it is any correction at all. In any event, the court does not accept the thirty-seven percent idle time figure proffered by defendant as accurate.

### D. *Overhead rates*

Daniel Harper calculated direct costs for KSA. His report is Px 9. It incorporates a statement of income and expense prepared by him that reflects an average overhead of fourteen percent over the contract period. The backup documents were not offered at trial, based on plaintiff's counsel's statement that they were unnecessary. During defendant's cross-examination of Walker, a KSA income statement was introduced that showed an overhead figure of fifteen percent. During defendant's cross-examination of Harper, he testified that he verified the overhead figures used by KSA in its income statement. (Px H–12). Based on those figures, he used a fourteen percent figure as overhead. This is only slightly more than the 13.14 percent calculated by the Government's auditors. The court allows the fourteen percent figure.

### E. *Bonding expenses*

KSA's summary damage exhibits, prepared for trial, claim bonding costs at one percent. No direct proof of bonding costs was introduced at trial. One indirect reference to them exists in the documentary record. It consists of a proposed change order that lists the bonding percentage as one percent (Dx B–61). The only other support for this item is in Walker's damage summary. The court notes that bonding is routinely required of government contractors. For the reasons expressed in Part I.A.2., *supra*, this is sufficient proof of bonding expenses. For more to be required, KSA should have been put on notice that defendant would demand specific testimony or documentary proof at trial of this item of cost.

### F. *Liquidated damages*

The contract calls for the contractor to pay daily liquidated damages of $3,500 for every day performance completion exceeds the termination date. The termination date was adjusted by agreement to November 11, 1986. The Bureau treated performance as complete on August 14, 1987, when testing of the ventilation system was finished. The Bureau withheld approximately $864,000 in retainage as liquidated damages. The actual amount of liquidated damages over 276 days would be approximately $966,000. In its claim, KSA conceded that completion went well beyond November 11. It argued substantial completion by July 1, 1987. It also conceded that to avoid damages for any of the period between November 11 and July 1, it would have to justify the delay.

The court finds that permitting defendant to litigate the question of liquidated damages as a defense to plaintiff's claim for return of the retainage does not prejudice plaintiff. There is no question that KSA completed the contract after the completion date. The contract price is reduced for each day of inexcusable delay up to completion. In both its claim for equitable adjustment and its complaint in this court, KSA correctly recognized that to establish its entitlement to recover any of the contract retainage, it bore the burden of showing not only that the contract was completed, but also that completion was either timely or, if untimely, that all or part of the delay was excusable. *See* Claim for Equitable Adjustment § III.A. (Mar. 8, 1989); Complaint ¶ 29. Furthermore, plaintiff was well aware at the time of the claim of the Government's assertion of a liquidated damages offset. In addition, the court holds that the return of the initial liquidated damages offset did not waive any rights the Government had to continue to seek liquidated damages as an offset to plaintiff's affirmative claim. The Government's rights were specifically reserved.

The Federal Circuit has allowed the Government to litigate set-offs and "mirror-image" claims even in the absence of a direct decision by the CO. In *Placeway Constr. Corp. v. United States,* 920 F.2d 903, 906–07 (Fed.Cir.1990), the court in effect deemed that the CO had granted the Government's previously unasserted claim for a set-off when it denied plaintiff's claim for payment

of the contract balance. *See also Sharman Co. v. United States*, 2 F.3d 1564, 1566, 1570 (Fed.Cir.1993) (implying that when two "mirror image" claims are "effectively the same claim, but made by [opposing] part[ies]," that a CO final decision on either claim would suffice to confer upon this court jurisdiction over both).

This case is admittedly different. The CO did not issue a final decision on plaintiff's claims. The Contract Disputes Act ("CDA") treats the absence of a timely CO decision as a denial of the contractor's claims. 41 U.S.C. § 605(c)(5) (1988). Thus, plaintiff's claims are deemed denied. Although in *Placeway* the CO's denial of the contractor's claim was expressed in a written decision, the Federal Circuit's reasoning was based not on the form of the denial, but on the logical relationship between the two claims. The court holds that the CO's constructive denial of KSA's claim for release of the retainage was logically equivalent to granting the Government's claim to keep the retainage. The only ground on which the Government could keep the retainage would be as liquidated damages. Thus, to the extent that the Government's assessed liquidated damages do not exceed the amount of the retainage, the Government may litigate them here. The Government, however, is precluded from recovering liquidated damages over and above the amount of the retainage because no CO decision, actual or constructive, exists regarding that portion of its liquidated damages offset; that is, to the extent that the Government's liquidated damages offset exceeds the retainage, it cannot be held to be the mirror image of KSA's claim to recover the retainage.

■ With respect to the actual substantial completion date, the court agrees with the Government that performance could not be treated as complete until testing of the ventilation system was concluded. The facility was not practicably useable until the ventilation system was tested. This was plaintiff's responsibility, and if indeed the system worked in July, there was no reason for KSA not to arrange to have it tested earlier.

■ The more difficult question has to do with the extended completion date. Although the evidence is admittedly confusing, the court is persuaded that the Government bears the responsibility for the delay in perfecting the Similkameen tie-in. Prior to the change in design, the contract simply could not be completed in a way that reasonably protected the orchardists. There was insufficient time in the off-season to make the switch to the new system and test it before the onset of possible freezing temperatures. The contract did not allow anything other than minor shutdowns during irrigation season. KSA bore the risk of failure. Before the change in design to a connection that permitted dual use, the decision to hook up the new system was irrevocable. KSA was not responsible for completing the design for the new tie-in. Consequently, the Government's delivery in March 1987 of the tie-in modification was the first time the contract could be completed without placing KSA in the unreasonable position of becoming an insurer of an inadequate design.

The net result is that delays by either party before March are subsumed. Plaintiff could not have reasonably been expected to complete without the redesign and some appropriate time to execute it. Once KSA had the modification, it did the installation in a few weeks.

Accordingly, the court concludes that the contract amount should be reduced by $3,500 per day for the period between April 2, 1987, one month after KSA received the tie-in instructions, and August 14, 1987. The contract price therefore, as adjusted herein, should be reduced by $469,000.

### G. *Escrow Interest*

■ KSA argues that the contract entitles it to receive all the interest from the escrow account established to hold the retainage regardless of the Government's offset of any portion of the principal as liquidated damages against KSA's recovery. The Government responds that the contract provides that it should receive a share of the escrow interest proportionate to its ultimate share of the retainage. The following contract provisions appear to govern the issue.

General Provision 7(c):

In making ... progress payments, there shall be retained 10 percent of the estimated amount until final completion and acceptance of the contract work....

Supplemental General Provision 49:

Notwithstanding any other provision of this contract, unless paid within thirty days, all amounts that become payable by the Contractor to the Government under this contract ... shall bear interest at the rate determined by the Secretary of the Treasury.... Amounts shall be due upon the earliest of (a) the date fixed pursuant to this contract; (b) the date of the first written demand for payment, consistent with this contract, including demand consequent upon default termination....

Special Provision 10:

Posting Securities in Lieu of Retained Percentages

(a) At his option, the Contractor may, subject to procedures prescribed by the Contracting Officer, deposit approved interest-bearing negotiable securities, with interest accruing to the Contractor, in lieu of retained percentages contempl[a]ted in clause No. 7 of the General Provisions (Standard Form 23–A).

. . . .

(c) If the Contractor elects to exercise his option, he shall notify the Contracting Officer, who will then provide him with a form of agreement to which he must subscribe and which will set forth the requirements deemed necessary to protect the interest of the Government to the same extent as would be the case if the option to post securities in lieu of retained percentages were not exercised....

(d) The securities shall be deposited with an escrow agent approved by the Contracting Officer....

The Supplemental Agreement governing the posting of securities, Mod. No. 4–CC–10–02570, dated August 10, 1984, contains the following relevant clauses:

1. In lieu of the procedures for handling retained percentages set forth in paragraph 7 of the General Provisions (Standard Form 23–A) of the contract, the Contracting Officer and the Contractor agree to the placement in escrow with the ... Escrow Agent, and pursuant to the procedures set forth in this agreement, notes or bonds of the United States of America or any state of the United States....

2. Upon proper execution of this agreement by the parties, the Contracting Officer shall forward to the Escrow Agent a check made payable to the Contractor representing amounts currently being retained under paragraph 7(c) of the General Provisions (Standard Form 23–A). Checks for any retained amounts properly payable from further progress payments will be similarly made payable to the Contractor and forwarded to the Escrow Agent.

3. The Escrow Agent shall, pursuant to receipt of an appropriate power of attorney from the Contractor, deposit sums received from the Contracting Officer in an escrow account subject to the terms of this agreement.

4. The Escrow Agent may upon receipt of proper instructions and authorization from the Contractor convert sums received from the Contracting Officer into any of the qualified securities identified in paragraph 1 of this agreement in accordance with the instructions of the Contractor. Alternatively, after notice to the Contracting Officer, the Contractor may deposit sufficient qualified securities with the Escrow Agent who may thereupon release the sums received from the Contracting Officer to the Contractor....

. . . .

6. The securities shall be made payable to the Contractor. The Contractor shall supply the Contracting Officer with a power of attorney in form satisfactory to the Contracting Officer, authorizing the Escrow Agent to convert the escrow account into cash, by sale or otherwise....

. . . .

10. Any interest actually paid on securities or on sums held by the escrow agent shall be handled as may be separately agreed upon by the Contractor and the Escrow Agent unless otherwise directed by the Contracting Officer.

11. .... [T]he Contracting Officer is authorized to render decisions as to whether the Contractor is ... indebted to the Government because of obligations arising under this contract, or otherwise. For the purpose of this agreement, it is therefore agreed that a determination of the Contracting Officer that ... the Contractor is indebted to the Government under this contract or for any other reason, shall be final and conclusive and that the Contractor's sole remedy in such instances shall be as provided under Clause No. 6 [the Disputes clause] of the General Provisions ... of the Contract. In accordance therewith, the Contractor hereby relinquishes any and all rights that he might have under the terms of the contract, this agreement, or otherwise, to file or prosecute any claim or demand which might seek to interfere with, delay, or prohibit the Contracting Officer from demanding the proceeds of the escrow account from the Escrow Agent or the Escrow Agent from delivering the same to the Government upon receipt of a proper demand from the Contracting Officer....

12. Upon receipt by the Escrow Agent of a determination by the Contracting Officer in writing pursuant to Clause No. 6 of the General Provisions ... of the contract that the Contractor is ... indebted to the Government as herein defined, the Escrow Agent ... shall sell and convert the securities then comprising the escrow account to cash and shall remit to the Contracting Officer within 15 days of receipt of said determination all sums realized therefrom up to the amount of the retention which would otherwise have been in the possession of the Government.

Special Provision 10(a), providing that the interest shall accrue to the contractor, combined with Provision 10 of the Supplemental Agreement, providing that any interest actually paid shall be handled as agreed by the contractor and the escrow agent unless otherwise directed by the CO, establishes a presumption that KSA is entitled to keep the escrow interest. No provision in the contract contradicts this presumption. Furthermore, the Government presented no evidence that the CO had directed KSA to dispose of the interest in any manner other than that which KSA chose in conjunction with the escrow agent.

The Government argues that, because Special Provision 10(c) refers to protecting "the interest of the Government to the same extent as would be the case if the option to post securities in lieu of retained percentages were not exercised," and because the Government would possess the principal and interest if KSA had not exercised its escrow option, the Government is entitled to a portion of the escrow interest now. The Government urges us to read that language of Special Provision 10 out of context, however. Special Provision 10(c) actually refers to the Supplemental Agreement, describing it as "set[ting] forth the requirements deemed necessary" to protect the Government's interest. Thus 10(c) appears to be more an admonition to the CO or drafter of the Supplemental Agreement to include sufficient protection for the Government rather than an interpretive instruction to the court to construe the agreement in favor of the Government. By using the language "requirements *deemed* necessary," the contract confers upon the CO the discretion, and therefore the burden, to include in the supplemental agreement those provisions sufficient to protect the Government. The court will not second-guess the CO's determination without a more compelling reason to do so.

The Government also argues that it is entitled to interest on its portion of the retainage under SGP 49 of the contract, *supra.* SGP 49 is clear, however, that interest may be assessed only when a payment is made more than thirty days after it is due. The clause goes on to define a payment such as the one at issue here as "due" on the date of "the first written demand for payment, consistent with this contract...." No written demand for payment was issued sufficient to trigger the interest obligation imposed by SGP 49. Although the Government did assess liquidated damages in a letter dated January 16, 1987, that letter did not include a demand for payment. The Government withheld as liquidated damages a portion of the amount due KSA on payment voucher 38, but it restored this money to KSA in pay-

ment voucher 39 pursuant to an April 3, 1987 agreement that the Government could accrue, but not withhold, liquidated damages until the project was completed. Px Q–1 tab 39; Px Q–5; Px Q–6. On March 6, 1989, the CO sent a letter to KSA expressing the view that the Government was entitled to $969,-500 [4] in liquidated damages, part of which would be covered by the contract retainage. Px Q–8. The CO took care to characterize the letter as neither a final decision nor a government claim. *Id.* Therefore, the court cannot construe that letter as a "written demand for payment, consistent with th[e] contract" as required by SGP 49. Two days after the CO sent the letter, KSA submitted its claims to the Government. No final decision or notice of decision on the claims was issued within sixty days and thus KSA's claims were deemed denied. 41 U.S.C. 605(c)(2), (5). This constructive denial cannot constitute the "written demand" contemplated by SGP 49 as no written document embodies the denial.

The effect of the court's decision is this: the contract price must be increased to reflect the equitable adjustments allowed in this opinion. From that amount two deductions will be made: one for payments already received and the other for liquidated damages. The net amount, without interest, will be offset by the CO's release of the principal amount in the escrow account. If the principal amount of the escrow account is less than the amount of the net equitable adjustment, calculated without interest, then interest will be paid on the balance from the date of the claim at the CDA rate. If the principal in the escrow account is larger than the net equitable adjustment, the principal balance will be returned to the Government, without interest. The interest in the escrow account is to be released to KSA jointly with its attorney. The court's intention is to assure the following: that KSA earns interest on the amounts in the escrow account since its creation; that KSA does not earn both CDA interest and escrow interest on the same amounts; and that the Government does not

get an affirmative recovery, only an offset against KSA's recoveries on its equitable adjustments.

## III. Other Matters

### A. *Counts XV and XVI*

On February 2, 1994, the court granted defendant's motion for summary judgment on Counts XV and XVI. The reasons for those dismissals were reserved until this opinion. Count XV sought interest on change proposals which were paid without the necessity of the filing of claims. The court agrees with defendant that the change proposals were not claims. Accordingly, as a matter of law they cannot earn interest. Count XVI sought delay damages for a period including the first six months of 1987. KSA is bound, however, by its assertions in *In re Kit–San Company and Azusa Constructors, d/b/a/ Kit San Azusa,* Bankr. No. 87–01132–H41, Adversary No. A87–0177–H41, an action brought against First Interstate Bank of Idaho, N.A. KSA's authorized representatives represented on several occasions in that action that the bank was responsible for delaying performance by KSA during the same period. After trial, the Bankruptcy court found that KSA had suffered delay-based damages because of the bank. KSA's representations in that action are binding on it in this action and are incompatible with seeking damages against the Government for delay during the same period. *See Weaver–Bailey Contractors, Inc. v. United States,* 19 Cl.Ct. 474, 476 (1990).

### B. *EAJA*

On April 8, 1994, KSA filed an application for attorney fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(d) (1988), with respect to counts 2, 3, 4, 6, 8, 10, 11, 12, 13, and 14, which were previously settled and the subject of a judgment entered on March 8, 1994. Plaintiff has indicated that it will be making a similar motion

---

4. The CO incorrectly calculated the number of days of delay as 277. The correct number of days—according to the dates in the letter—was 276, which would have entitled the Government to claim $966,000 in liquidated damages, absent justification by KSA.

with respect to the judgment entered as a result of this opinion. Defendant is therefore directed to make its response to the pending application at the same time it responds to a future application.

## CONCLUSION

Accordingly, the Clerk is directed to enter a judgment for plaintiff, payable jointly to William Weinstein and Kit–San–Azusa in the amount of $121,776.80, plus interest from March 9, 1989, pursuant to 41 U.S.C. § 611 (1988). Appendix A to this order will become part of the judgment. Costs to plaintiff.

## APPENDIX A

I. Claims as adjusted

| | | |
|---|---|---|
| A. | Osoyoos Pump Plant | $229,704.32 |
| B. | West Osoyoos Tank | $ 87,002.38 |
| C. | Pipeline loss of efficiency | $274,070.10 |
| | Total claim adjustment | $590,776.80 |

II. Calculation of amount of judgment

| | |
|---|---|
| Contract amount | $15,704,649.44 |
| Total claim adjustment | $ 590,776.80 |
| Adjusted contract amount | $16,295,426.24 |
| Less Prior payments | $14,840,315.98 |
| Less liquidated damages | $ 469,000.00 |
| Less escrow principal to KSA[1] | $ 864,333.46 |
| Net award subject to CDA interest | $ 121,776.80 |

---

1. Pursuant to the opinion of November 10, 1994, KSA or its attorney in trust will receive the principal and accumulated interest in the escrow account.