**VOLMAR CONSTRUCTION, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**Nos. 93–540C, 94–335C.**

United States Court of Federal Claims.

Feb. 16, 1995.

Ray Goddard, New York City, for plaintiff. Gregory E. Ronan and Richard T. Tschampel, Goddard & Blum, of counsel.

Armando O. Bonilla, Washington, DC, with whom was Asst. Atty. Gen. Frank W. Hunger, for defendant.

## OPINION

MILLER, Judge.

This case is before the court after argument on cross-motions for summary judgment. The issue is whether asserted setoffs satisfy the jurisdictional prerequisites for government claims as set forth in the Contract Disputes Act of 1978, 41 U.S.C. §§ 601–613 (1988 & Supp. V. 1993) (the "CDA").

## FACTS

The following facts are undisputed, unless otherwise noted. Volmar Construction, Inc. ("plaintiff"), a New York corporation, is a general contractor. On August 21, 1991, plaintiff entered into a firm fixed-price contract with the General Services Administration ("GSA") for the renovation and restoration of the Alexander Hamilton Custom House. Consequent to several change orders issued over the course of the contract,

the total price of the contract increased from $4,968,000.00 to $5,817,166.20.

GSA has paid plaintiff in the amount of $5,524,235.20, leaving a contract balance of $292,931.00. Plaintiff's motion for partial summary judgment seeks only $233,731.00, as opposed to the full contract balance, so the motion does not address defendant's counterclaim of $59,200.00 in liquidated damages stemming from plaintiff's alleged failure to complete certain contract work in a timely manner.[1]

Plaintiff contends that because it "duly completed all obligations on its part required to be performed under the contract," GSA owes it $233,731.00. Plf's Proposed Findings of Uncontroverted Fact No. 4 filed Oct. 26, 1994. Defendant disputes plaintiff's characterization of its contract performance, maintaining that GSA properly withheld $278,231.00 of the $292,931.00 contract balance, thereby entitling plaintiff to no more than $14,700.00.[2] Because GSA included the liquidated damages penalty in the $278,231.00 withholding and this amount does not form the basis of plaintiff's motion, the present dispute devolves to whether GSA properly withheld $219,031.00, *i.e.*, $278,231.00–$59,200.00.

The following five items comprise the $219,031.00 withheld by GSA:

1. GSA withheld $32,096.00 representing credits for deleted work identified in Item Nos. 7, 12, and 13 of the Request for Proposal ("RFP") No. 25, dated January 19, 1994. According to the declaration of Steven Barry, a GSA contract specialist, the parties executed the contract modification with the exception of Item Nos. 7, 12, and 13. Plaintiff rejected these items in its cost proposal dated February 14, 1994, because the items sought credits for work deletions, although the work was never part of the original contract.

For example, in Item No. 7, GSA requested credit for the deletion of the internal wiring of certain light fixtures. In its cost proposal, plaintiff denied this credit because Amendment No. 4, issued prior to the date on which the original contract was bid, deleted the light fixtures referenced in Item No. 7, which, according to plaintiff, signified the elimination of the associated internal wiring requirement. Plaintiff argued in its proposal that GSA cannot exact credits for wiring work allegedly deleted under the contract when the work never was part of the original contract specifications.

2. GSA withheld $165,885.00 representing credits for deleted work contained in Item Nos. 1–7 of RFP No. 26, dated October 4, 1993. According to Mr. Barry, the parties never executed this proposed contract modification. In its cost proposal dated October 19, 1993, plaintiff contested the validity of the credits requested, noting that some of the work deletions, for which GSA sought credit, concerned tasks which were not part of the original contract.

3. GSA withheld $15,750.00 for the cost of repairing freight elevator No. 7. Defendant contends that plaintiff damaged the elevator while the elevator was under its control and that plaintiff had a contractual obligation both to repair the elevator and to pay for any costs associated with such repair.

The record indicates that on October 15, 1993, Contracting Officer Kin Moy first told plaintiff to provide GSA with a restoration plan for the damaged elevator. Plaintiff responded on November 1, 1993, stating that the October 15 letter erroneously presumed that plaintiff was solely liable for all damage caused. Plaintiff, however, "agree[d] to participate in its fair share to correct the damage once a determination ha[d] been made between users as to responsibility and prorated [as to] cost."

---

1. Plaintiff concedes that GSA is entitled to withhold $59,200.00 pursuant to Contracting Officer Rothella Halliburton's final decision issued on June 21, 1994, concerning the liquidated damages assessment, pending resolution of the issue at trial. Unlike the documents on which defendant relies as notice of its other setoffs, the contracting officer's final decision on liquidated damages explained the manner in which the

damages assessment was derived and summarized the various appeal options available to plaintiff.

2. Defendant is willing, at this time, to pay plaintiff the $14,700.00 currently due under the contract.

On November 30, 1993, the contracting officer sent plaintiff another letter reminding plaintiff of its responsibility and noting that a failure to respond by December 8, 1993, would result in GSA's "backcharg[ing] any extra costs to ... [plaintiff]." On December 3, 1993, plaintiff reiterated that it had not been given full control over the elevator and noted that there were at least seven different types of users. Based on a total repair estimate of $21,000.00, plaintiff offered a credit of $3,000.00 representing its share of the damage as one of the seven users.

In a letter dated March 3, 1994, GSA denied plaintiff's credit proposal and noted that, based on limited elevator usage by other parties, plaintiff should bear 75 percent of the total costs of repair, resulting in the $15,750.00 charge. The letter further stated, in effect, that plaintiff's acceptance of the charge would be the basis of the issuance of a credit RFP to plaintiff. Plaintiff disputes the charge, contending that GSA improperly allocated responsibility for the elevator damage.

4. GSA withheld $20,000.00 because certain work associated with the basement and rotunda areas of the project site was not completed, as required by the contract. Defendant asserts that GSA has determined that, as of this date, it is entitled to only $300.00 of the retained amount, representing the cost of an exit light that plaintiff failed to install in the rotunda area. By letter dated June 27, 1994, GSA requested that plaintiff furnish the light. Although plaintiff does not dispute that it failed to install the exit light, plaintiff does dispute the Government's entitlement to $300.00.[3]

5. GSA withheld $5,000.00 for the cost of repairing deficiencies in the painting of the project site. GSA reported these deficiencies to plaintiff as early as October 1993 and requested plaintiff to take corrective action. Plaintiff attempted to remedy the situation in the spring of 1994, but the same problems later resurfaced, as GSA informed plaintiff in letters dated September 7 and October 20, 1994.

Plaintiff denies responsibility for the alleged painting deficiencies and claims that the cost of the required repairs does not exceed $300.00. In a December 29, 1994 letter to Contracting Officer Moy, plaintiff contested GSA's allegations that it had failed to exercise proper quality control procedures, citing a report indicating that a number of factors beyond plaintiff's control had contributed to the paint problems, including both the condition of the plaster and improper temperature control throughout the building.

Defendant contends that GSA apprised plaintiff of each of the items underlying its withholding. Plaintiff disagrees, claiming that GSA only apprised it of the liquidated damages claim, pursuant to the June 21, 1994 contracting officer's final decision. Plaintiff maintains that it "first received notice of the[ ] credits or offsets when it received progress payment # 16....", Plf's Statement of Genuine Issues filed Jan. 13, 1995, ¶ 7, in Construction Contract Payment Voucher No. 16, dated August 16, 1994 ("Voucher No. 16"), and accompanying GSA "Inspection Report on Work Under Contract" ("the Inspection Report" or "the Report"), dated August 12, 1994.

The Inspection Report asserted GSA's right to withhold $292,931.00 and set forth the bases and amounts of liability underlying that withholding. The Report identified five setoffs, differing from the list of setoffs described above in two respects. First, the Report included the $59,200.00 liquidated damages claim. Second, and most important, the Report made no reference to withholding for painting deficiencies. In fact, the figure $5,000.00 does not appear in the Report. That amount only surfaced during the course of this litigation.

Although plaintiff claims that it did not receive notification of GSA's withholding until August 16, 1994, the record indicates that plaintiff had some knowledge of the setoffs in 1993. Specifically, on June 14, 1993, plaintiff

3. The only document of record that sets forth a damages figure corresponding to the omitted contract work is the GSA "Inspection Report on Work Under Contract," accompanying the August 16, 1994 Construction Contract Payment Voucher No. 16, which cites the $20,000.00 deficiency for "incomplete contract work," including the rotunda exit light. The $300.00 figure corresponding to the exit light was identified only during litigation.

submitted a letter to GSA requesting $385,-755.96 for completed work and a "refund of the substantial retainage." GSA responded by letter dated June 17, 1993, stating that no additional payment is due under the contract, given "[t]he value of outstanding punch list items, credits for work deleted from the contract, anticipated credits for RFP # 23 and RFP # 24 and the accumulated cost of liquidated damages."

On June 23, 1993, plaintiff informed GSA that it deemed GSA's actions to be a breach of contract and further requested that GSA supply plaintiff with a detailed breakdown of the cost calculations comprising the claimed setoffs. Thereafter, on July 2, 1993, plaintiff submitted a claim for the contract balance totalling $385,756.00. Defendant admits that the contracting officer did not render a final decision with respect to this matter.

In briefing and during argument, defendant cited additional evidence indicating that GSA fully apprised plaintiff of the nature of its withholding prior to Voucher No. 16. Defendant relied on RFP Nos. 25 and 26; the parties' correspondence concerning the elevator damage and missing exit light; and Construction Contract Payment Voucher No. 15 ("Voucher No. 15"), dated September 17, 1993, which indicated a $334,735.00 withholding "for work not completed." Defendant noted that each payment voucher preceding Voucher No. 15 contained the same, or a similar, designation.

Plaintiff filed a 17–count complaint in the United States Court of Federal Claims on May 23, 1994. On October 26, 1994, plaintiff moved for partial summary judgment in the amount of $233,731.00 with respect to the Twelfth Cause of Action in its Amended Complaint. Defendant opposed and cross-moved, asserting that plaintiff is entitled as a matter of law to no more than $14,700.00. Trial has been scheduled.

## DISCUSSION

### I. *Plaintiff's entitlement to $14,700.00*

In briefing and during argument, defendant admitted that plaintiff is entitled to $14,700.00 of the retained contract balance. Defendant further represented that the Government is willing to forward that amount immediately to plaintiff. Plaintiff's motion is granted as to this amount.

### II. *The assertion of government setoffs*

Defendant maintains that it properly withheld the remaining contract balance based on government setoffs. Plaintiff argues that the court lacks jurisdiction to consider five of the asserted setoffs because the contracting officer did not render a final decision as to them before the complaint was filed.[4] Plaintiff relies on *Placeway Constr. Corp. v. United States*, 18 Cl.Ct. 159 (1989), *aff'd in part, vacated in part*, 920 F.2d 903 (Fed.Cir.1990), a case addressing the jurisdictional requirements of the CDA with respect to government claims.

The CDA provides little guidance as to what constitutes a valid government claim. The CDA states only that "[a]ll claims by the government against a contractor relating to a contract shall be the subject of a decision by the contracting officer...." 41 U.S.C. § 605(a). The CDA further requires that "[t]he contracting officer ... issue his decisions in writing, and ... furnish a copy of the decision to the contractor. The decision shall state the reasons for the decision reached, and shall inform the contractor of his rights as provided ... [under the CDA]...." *Id.*

■ Because the CDA does not specify what constitutes a valid "claim," any contested claim should be evaluated in terms of the regulations implementing the Act, the relevant contract language, and the facts of the case. *Dawco Constr., Inc. v. United States*, 930 F.2d 872, 877 (Fed.Cir.1991). Federal Acquisition Regulation ("FAR") § 33.201, 48 C.F.R. § 33.201 (1993), defines "claim" as "a written demand or written assertion *by one of the contracting parties* seeking, as a matter of right, the payment of money in a sum

---

4. Plaintiff does not dispute that on June 21, 1994, the contracting officer rendered a final decision with respect to the sixth government setoff, the liquidated damages claim; this setoff, however, is not the subject of plaintiff's motion for partial summary judgment. *See supra* at pp. 749–750.

certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to the contract...." (Emphasis added.)

In *Placeway* the Claims Court held that a government setoff was a government claim, because a setoff "is tantamount to seeking 'the adjustment ... of contract terms....'" 18 Cl.Ct. at 164 (quoting 48 C.F.R. § 33.201 (1988)). The Federal Circuit concurred that a government setoff was a government claim, but stated "that the government claim is better characterized as a claim seeking incidental and consequential damages for Placeway's alleged breach of the contract....," rather than as an adjustment of contract terms. 920 F.2d at 906, n. 1.

The Federal Circuit also addressed the issue of whether the contracting officer had rendered a final decision on the government claim. The contractor had submitted an uncertified claim for the balance due under the contract, additional work costs, extended overhead expenses, and an adjustment of the contract performance time to allow for delay. Within approximately three months, the contracting officer dispatched a letter denying the contractor's request for the balance due, citing contractor delay as the basis for the withholding. The contracting officer also implied that the amount of the asserted setoff may be redetermined at a future date.

Although the setoff amount was subject to possible modification, the appeals court in *Placeway* held "that the CO [contracting officer] *effectively* made a final decision on the government claim...." 920 F.2d at 906 (emphasis added). In support of its holding with respect to finality, the court noted that "issues of liability and of damages should ... be resolved before judicial review is sought...." *Id.* (citation omitted). The court then ruled that the contracting officer's decision complied with these prerequisites because the contracting officer had determined that the basis of liability was delayed performance and that the damages constituted the contract balance.

The requirement to provide adequate notice of the basis and amount of liability, as discussed in *Placeway*, actually pertains to the nature of a claim, as opposed to whether the contracting officer issued a final decision. *Contract Cleaning Maintenance Inc. v. United States*, 811 F.2d 586, 592 (Fed.Cir.1987) (citing cases) (holding that to qualify as valid claim, contracting officer must have "adequate notice of the basis and amount of the claim"); *see also Transamerica Ins. Corp. v. United States*, 973 F.2d 1572, 1578 (Fed.Cir.1992) (same). Plaintiff maintains that the contractor and the Government have reciprocal obligations under the CDA and, therefore, under *Contract Cleaning* and *Placeway*, the Government must set forth the basis and amount of liability underlying any claim. The court agrees and holds that, although *Placeway* characterized a government setoff as a government claim, such a claim is not perfected and does not become a valid CDA claim unless the claim specifies the basis for, and amount of, liability comprising the claim.

*Placeway* involved only one basis for liability and accordingly one damages amount. The contracting officer cited contractor delay as the basis for liability and the contract balance as the amount of damages assessed. In this case the Government asserts six different setoffs, each involving a different sum of money.[5] This court interprets *Placeway* and *Contract Cleaning* and the latter's progeny as requiring the Government to set forth in any claim the specific basis of liability and the amount corresponding to each basis. Thus, if the Government asserts six unique setoffs as government claims, the Government must set forth the basis of liability with respect to each setoff and include the amount of liability corresponding to that particular setoff. Absent this information, the Government has not asserted a valid claim under the CDA.

Defendant advances three alternative arguments that GSA satisfied the CDA by complying with both the claim and contracting officer final decision requirements. Each

---

**5.** The sixth setoff concerning liquidated damages is not the subject of the parties' cross-motions for

summary judgment. *See supra* at p. 749.

of these arguments implicates different documents; the sufficiency of these documents will be addressed seriatim.

### 1. *Contract Payment Voucher No. 16 and the Inspection Report*

*1) Did the Government perfect a claim?*

Defendant maintains that Voucher No. 16, dated August 16, 1994, and the accompanying GSA Inspection Report, dated August 12, 1994, qualify as a valid claim for which the contracting officer rendered a final decision. The Voucher indicates that GSA withheld $292,931.00 "for work not completed, credit items & liquidated damages." The attached Inspection Report clarified the basis of this withholding. The Report identified the basis of liability for five of the government setoffs and set forth the amount of damages associated with each setoff. The setoffs addressed in the Report include: 1) credits for deleted work contained in Item Nos. 7, 12, and 13 of RFP No. 25; 2) credits for deleted work set forth in Item Nos. 1–7 of RFP No. 26; 3) elevator damage; 4) incomplete contract work, including rotunda exit light; and 5) liquidated damages.

The Inspection Report does not reference paint deficiencies as a basis for GSA's withholding. Although the record indicates that the parties engaged in a discourse through letters concerning the deficiencies, none of the letters shows that GSA intended to withhold money due under the contract to correct the paint problem. Instead, GSA's letters merely informed plaintiff as to the existence of the problem and took the position that it was plaintiff's responsibility to correct the deficiencies. For example, in the October 20, 1994 letter, Contracting Officer Moy stated that plaintiff "was requested to observe the [paint] condition and to prepare a program for the final correction of th[e] plaster/paint problem." The letter closed requesting plaintiff's attention to the matter.

■ The first mention of GSA's actually withholding money for the paint deficiencies occurred on December 12, 1994, via the declaration of Mr. Barry, submitted by defendant in support of its cross-motion for summary judgment. Mr. Barry stated that GSA had withheld $5,000.00 based on a GSA estimate of the cost of repairing the paint deficiencies. The statements of Mr. Barry, a contract specialist, made in the course of litigation do not translate into the actions of the contracting officer. The record, in fact, is devoid of any evidence indicating that the contracting officer, at any time, made a determination as to the amount of liability, *i.e.*, $5,000.00, concerning the paint claim. Since the contracting officer did not determine both the basis and amount of liability, the paint claim does not qualify as a valid CDA claim and therefore the court lacks jurisdiction over this government setoff. *See Placeway*, 920 F.2d at 906; *Contract Cleaning*, 811 F.2d at 592.

■ The issue then becomes whether Voucher No. 16 and the Inspection Report qualify as a valid claim under the CDA with regard to the remaining government setoffs. In terms of defining a claim, the FAR purport to create reciprocal requirements. *See, e.g.,* FAR § 33.201 (defining claim as "a written demand or written assertion *by one of the contracting parties*") (emphasis added). The FAR, however, include specific requirements which appear to be applicable only to contractors. For example, in defining the term "claim," FAR § 33.201 provides:

> A voucher, invoice, or other routine request for payment that is not in dispute when submitted is not a claim. The submission may be converted to a claim, by written notice to the contracting officer as provided in 33.206(a), if it is disputed either as to liability or amount or is not acted upon in a reasonable time.

The reference to FAR § 33.206(a) concerns the initiation of contractor, not government, claims. The FAR restriction disables contractors from submitting only a "voucher, invoice, or *other routine request for payment*" and thereby purporting to assert a valid claim under the CDA. FAR § 33.201 (emphasis added). To qualify as a claim, the contractor must submit a writing accompanying the "voucher, invoice, or other routine request for payment." *Id.* Voucher No. 16 cannot be defined as a "routine request for payment."

The FAR provide no guidance as to whether and how the "voucher" requirement applicable to contractors translates to non-routine payment vouchers issued by the Government. The court therefore deems the requirement inapposite to government claims. Because Voucher No. 16 and the Inspection Report specify the bases of liability and the amount of damages associated with the four setoffs that are the subject of the parties' motions, the documents qualify as valid CDA claims. *Contract Cleaning,* 811 F.2d at 592 (holding that a series of correspondence examined together may constitute a claim).

### 2) *Did the contracting officer render a final decision on the government claims?*

■ The CDA further requires that each perfected claim be the subject of a final contracting officer's decision. *See* 41 U.S.C. § 605(a). The Federal Circuit has addressed the issue of finality in both *Placeway* and *Sharman Co. v. United States,* 2 F.3d 1564 (Fed.Cir.1993). In *Placeway* the court held that the contracting officer's decision letter was "no less final because it failed to include boilerplate language usually present for the protection of the contractor." 920 F.2d at 907. Thus, under *Placeway,* Voucher No. 16 and the attached Inspection Report could qualify as a final decision, even though the contracting officer did not explain the contractor's appeal rights or indicate that the documents represented a final decision.

Three years later in *Sharman* the Federal Circuit revisited the issue of whether language of finality was required to perfect a final decision on government claims. The court held that a government demand letter did not qualify as a final decision because it lacked the magic words "final decision." The court specifically noted that "th[e] letter simply states that it is a 'notice and demand for payment'; it does not contain the customary designation 'final decision....'" 2 F.3d at 1570. The *Sharman* court distinguished *Placeway* in a footnote, but on separate grounds. *Id.* at n. 9. The distinction concerned the *Placeway* court's holding that a final decision may be present even though the contracting officer implied that the amount withheld may be subject to future

revision. Although the amount demanded in *Sharman* was later halved, the Federal Circuit ruled that the demand letter did not qualify as a final decision, because, unlike in *Placeway,* the letter invited negotiation of the amount demanded.

Neither *Placeway* nor *Sharman* discussed either the CDA's language or FAR § 33.211, which lists the requirements for a contracting officer's final decision. The CDA expressly requires that the contracting officer "state the reasons for the decision reached, and ... inform the contractor of his rights as provided ... [under the CDA.]" 41 U.S.C. § 605(a). FAR § 33.211 provides that the written decision should include a statement indicating that the decision constitutes "the final decision of the Contracting Officer." FAR § 33.211(a)(4)(v). Section 33.211 also requires that the decision include a paragraph concerning plaintiff's appeal rights as set forth in FAR § 33.211(a)(4)(v).

This court cannot resolve the inconsistency between the rule announced in *Placeway* and those set forth in *Sharman,* the CDA, and the FAR. Arguably, *Sharman* may be distinguished with respect to its finality holding because *Sharman,* unlike *Placeway,* involved an affirmative request for relief whereby the Government sought repayment of progress payments forwarded to the contractor. Although the Federal Circuit has not advanced this distinction, or addressed further the question of whether and how the statutory language, which on its face requires providing the contractor notice of its appeal rights, can be relaxed, this court follows the *Placeway* rule with respect to finality, given that the instant case, like *Placeway,* involves government setoffs. Thus, Voucher No. 16 and the Inspection Report need not bear the magic words "final decision" or contain information concerning the contractor's appeal rights to qualify as a valid contracting officer's final decision.

In support of its holding that the contracting officer "effectively made a final decision," the *Placeway* court noted that the contractor had completed performance under the contract; the parties did not dispute the price for the work completed; and the contract price was due upon completion of the con-

tract work. 920 F.2d at 906. During argument plaintiff noted that it had completed work by June 17, 1993, well before the issuance of Voucher No. 16. *See* Transcript of Proceedings, *Volmar Construction, Inc. v. United States,* Nos. 93–540C & 94–335C, Jan. 20, 1995, at 17–18 (hereinafter "Tr."). Defendant offered no dispute. Moreover, the parties did not disagree on the original contract price or its being due and payable upon completion of the contract. Thus, the Voucher and Inspection Report appear to fall within the relaxed final decision standard enunciated in *Placeway.*

### 3) *Did the final decision on the government claims issue before the complaint was filed?*

One jurisdictional obstacle, however, remains with respect to Voucher No. 16 and the Inspection Report. This obstacle, first articulated in *Sharman* and recently addressed in *Kit-San-Azusa v. United States,* 32 Fed.Cl. 647 (Fed.Cl.1995), concerns the statutory ban on concurrent jurisdiction of both a court and an agency with respect to the same claim. 28 U.S.C. §§ 516–520 (1988). *Sharman* held that "[o]nce a claim is in litigation, the Department of Justice gains exclusive authority to act in the pending litigation, . . . . That exclusive authority divests the contracting officer of his authority to issue a final decision on . . . [a] claim . . . ." *Sharman,* 2 F.3d at 1571 (citations omitted). To understand the scope of the *Sharman* rule, the factual predicate for the Federal Circuit's decision must be reviewed.

The contractor in *Sharman* filed its complaint on February 2, 1990, seeking, among other relief, invalidation of a default termination and recovery of all uncompensated costs incurred during the performance of the contract. "The complaint also included a count in quantum meruit asserting entitlement to all the government's progress payments, which . . . [the contractor] character-

ized as 'payment for the work performed' on the contract, plus additional monies." *Id.* at 1567 (footnote omitted). By its answer defendant denied the contractor's entitlement to the progress payments. Defendant also moved to dismiss for lack of jurisdiction. In response to the trial court's partial dismissal, the contractor amended its complaint specifically to challenge the October 18, 1990 final decision letter of the contracting officer asserting a government claim for the return of unliquidated progress payments. Defendant then counterclaimed for the return of those same payments.

The issue before the Federal Circuit was whether the Claims Court had jurisdiction to entertain both the contractor's claim in its amended complaint challenging the Government's entitlement to the progress payments and the Government's counterclaim. Defendant argued that the Claims Court lacked jurisdiction over the Government's claim for the return of unliquidated progress payments because the contracting officer did not render a final decision on that claim prior to commencement of the suit. The appeals court agreed with defendant.

Specifically, the court held that the contractor's alleged entitlement to government progress payments under the quantum meruit theory in its initial complaint constituted "the same 'claim'" as that set forth in both plaintiff's amended complaint and the Government's counterclaim. 2 F.3d at 1571. The court reasoned that the claims were the same "because in each case the 'claim' allege[d] entitlement to the same money based on the same partial performance, only under a different legal label." *Id.*[6]; *see Boeing Co. v. United States,* 31 Fed.Cl. 289, 292 (1994) (ruling that the problem identified in *Sharman* "was the identity between the complaint and the CO's [contracting officer's] decision in terms of the *precise quantum of relief sought*") (emphasis added). On this basis

---

**6.** The Federal Circuit further stated that although Sharman amended its complaint . . . to include an explicit challenge to the government's right to return of the unliquidated progress payments, this amendment merely restated . . . Sharman's earlier assertion of entitlement to those same payments for the same partial performance in the quantum meruit

count of its original complaint. Therefore, it is actually the same claim. Similarly, the added government counterclaim involves the same unliquidated progress payments and the same partial performance, and is therefore effectively the same claim, but made by the other party. . . .

2 F.3d at 1569–70.

the court concluded that the progress payment claim was in litigation at the time the contractor filed its original complaint in the Claims Court.

Noting that "[o]nce a claim is in litigation" the contracting officer has no authority to issue a final decision on that claim, the *Sharman* court held that jurisdiction must be determined as of the date the original complaint was filed. *See* 2 F.3d at 1571 (citing cases). The court also specified that "a final decision by the contracting officer on a claim, whether asserted by the contractor or the government, is a ... prerequisite" for Claims Court jurisdiction. *Id.* at 1568–69 (citation & footnote omitted); *see Joseph Morton Co. v. United States,* 757 F.2d 1273, 1279–80 (Fed. Cir.1985) (holding that both government and contractor claims must be subject of contracting officer's final decision).

Finding that no final decision had been rendered at the time of the filing of the original complaint with respect to either the Government's counterclaim or the contractor's mirror-image claim set forth in its amended complaint, the court ruled that the Claims Court had no jurisdiction to entertain the claims. The only valid final contracting officer's decision addressing the Government's claim was issued on October 18, 1990, more than six months after the filing of the original complaint. Because the progress payment claim was in litigation at that time, the court held that the contracting officer lacked authority to issue the decision and that the decision was "a nullity." *Sharman,* 2 F.3d at 1572.

The Court of Federal Claims recently extended the *Sharman* rule in *Kit–San–Azusa.* The court stated that *Sharman* "impl[ied] that when two 'mirror image' claims are 'effectively the same claim, but made by [opposing] part[ies],' ... a CO [contracting officer's] final decision on either claim would suffice to confer upon this court jurisdiction over both." *Kit–San–Azusa,* 32 Fed.Cl. at 663–64 (emphasis added). The court further explained that the contracting officer's denial of the claim in *Placeway* "was based not on

the form of the denial, but on the logical relationship between the two claims." *Id.,* 32 Fed.Cl. at 664. Based on these interpretations, the court ruled that a contracting officer's constructive or deemed denial of a contractor's claim for the release of any retainage under the contract "was logically equivalent to granting the Government's claim to keep the retainage." *Id.* The court, however, limited its holding, noting that "[t]he only ground on which the Government could keep the retainage would be as liquidated damages...." *Id.*

This court respectfully declines to follow *Kit–San–Azusa.* The holding in *Kit–San–Azusa* is not consistent with *Sharman, Placeway,* and the CDA. *Sharman* stands for the proposition that whenever a claim is in litigation, the contracting officer lacks authority to take any action, including issuing a final decision, on that claim. In *Sharman* the Federal Circuit, in effect, ruled that when a later claim is derivative of, or constitutes the "same claim" as, a claim set forth in the original complaint, the jurisdiction of the Court of Federal Claims must be determined as of the date of the filing of the original complaint, because that date delimits when the claim became the subject of litigation and when the contracting officer lost authority to take any action on the claim. This court therefore interprets *Sharman* as identifying both what constitutes the "same" claim or "derivative" claim and as establishing the date on which jurisdiction is determined with respect to such claims.

This court does not read *Sharman* as altering the jurisdictional requirement that both contractor and government claims be the subject of a final contracting officer's decision. *Sharman* expressly stated that the CDA requires that both contractor and government claims be the subject of a final contracting officer's decision.[7] The *Sharman* court held only that no final decision had been rendered on either the Government's counterclaim or the contractor's mirror-image claim for progress payments as of the date on which the original complaint was

---

7. Both the majority and dissent in *Sharman* solidly agree on this point. 2 F.3d at 1568–69, 1575

(dissenting op.).

filed and, therefore, that the court lacked jurisdiction with regard to those claims. The court did not rule, as *Kit–San–Azusa* holds, that only one final decision was required. Indeed, it might be observed that *Sharman* emphasizes the CDA's express requirement that contractor and government claims are separate. Both the contractor and an agency must undergo an analysis (as to the basis and amount of liability) that yields a claim. This process furthers the CDA's objective of resolving claims at the administrative level; a contractor thus does not drag the Government into litigation by submitting a claim on the same subject as a potential government setoff; rather, the agency must complete a process to perfect its setoff as a claim.

*Kit–San–Azusa* is also inconsistent with *Placeway*, which requires the contracting officer to determine the basis and amount of liability underlying a government claim. *Kit–San–Azusa* authorizes jurisdiction over a government claim whenever the same claim by the contractor is the subject of a constructive or deemed denial. 41 U.S.C. § 605(c)(5). In the case of a deemed denial, the contracting officer presumably lacks the opportunity to identify the basis and amount of liability underlying a government claim. Moreover, the CDA contains no provision allowing a deemed denial of a government claim. Indeed, the CDA requires that all government claims be the subject of a final contracting officer's decision before the Court of Federal Claims can exercise jurisdiction. 41 U.S.C. § 605(a).

Finally, the *Kit–San–Azusa* court interpreted *Placeway* as hinging "not on the form of the [contracting officer's] denial, but on the logical relationship between the two claims." *Kit–San–Azusa*, 32 Fed.Cl. at 664. In addressing whether a final decision had been rendered, the *Placeway* court did not address the issue of the identity or relationship of the claims, as discussed in *Sharman*, because the contracting officer in *Placeway* issued his final decision before the contractor filed its complaint. At that time the contracting officer had full authority to issue the decision. *See Sharman*, 2 F.3d at 1571 (holding that "[o]nce a claim is in litigation,"

the contracting officer has no authority to render decision).

■ In light of *Sharman*, the issue in this case is whether the Government's claim to the contract balance constitutes the same claim as plaintiff's claim for the contract balance set forth in Count 12 of its original complaint. Interpreting *Sharman* as focusing on the identity of the quantum of relief sought by both parties, the court holds that plaintiff's claim for the contract balance and the Government's claimed entitlement, through various setoffs, to that same balance constitute the "same" claim. *See Boeing*, 31 Fed.Cl. at 292 (holding that "*Sharman* focused ... [on] the identity between the complaint and the CO's [contracting officer's] decision *in terms of the precise quantum of relief sought....*") (Emphasis added.)

Jurisdiction as to the Government's claimed entitlement to the contract balance therefore must be evaluated as of the date plaintiff filed its original complaint, which was May 23, 1994. The court lacks jurisdiction based on Voucher No. 16 and the Inspection Report, which purportedly qualify as a final decision under *Placeway*, because these documents were issued on August 16 and 12, 1994, respectively. This interpretation supports the policy driving *Sharman*, which disables the contracting officer from taking any action on a claim that is the subject of pending litigation.

As a consequence of the foregoing, the court *sua sponte* must evaluate its jurisdiction with regard to the Government's claim for liquidated damages. In Count 13 of its original complaint, plaintiff included a request for time extension due to delays associated with the completion of the fire alarm test. On July 8, 1993, plaintiff filed a claim with the contracting officer concerning the time extension and requested a final decision. Defendant counterclaimed in its answer for $59,200.00 in liquidated damages due to contractor delay in completing the project. Plaintiff then amended its complaint on September 14, 1994, to challenge specifically the liquidated damages penalty. These facts differ from *Sharman*. In this case plaintiff amended its complaint in response to the Government's counterclaim, whereas in *Shar-*

*man* the contractor amended the complaint before the Government counterclaimed, thereby raising the issue of jurisdiction with regard to both claims. The issue in the case at bar concerns only whether the court has jurisdiction over the Government's counterclaim.

The court holds that defendant's counterclaim derives from or constitutes "the same 'claim' " as stated in Count 12 of the original complaint, wherein plaintiff requested the overall balance due on the contract. The $59,200.00 constitutes yet another basis for the Government's retention of the contract balance. Jurisdiction therefore must be evaluated as of the date plaintiff filed its original complaint. Because the final contracting officer's decision concerning liquidated damages was not issued until June 21, 1994, the court cannot exercise jurisdiction with respect to the Government's counterclaim for liquidated damages.

### 2. *Voucher No. 15 and all preceding correspondence*

■ During argument, in further support of its argument that GSA has asserted claims that it can pursue as setoffs in this litigation, defendant relied on Voucher No. 15 dated September 17, 1993, and all preceding correspondence between the parties, which was attached to Mr. Barry's declaration, arguing that such documents taken together informed plaintiff as to the bases and corresponding amounts of liability underlying GSA's withholding. *See* Tr. at 36–37, 52–53. According to defendant's theory, the correspondence attached to the declaration dated prior to September 17, 1993, should identify liability amounts totalling $334,735.00, which was the amount withheld "for work not completed" pursuant to Voucher No. 15.

The court has examined carefully the submissions attached to Mr. Barry's declaration and can find few documents dated prior to September 17, 1993. The only such documents are Voucher Nos. 1–14 and two estimate worksheets in support of RFP Nos. 25 and 26, dated September 1, 1993. As defendant concedes, the vouchers do not fall within the rubric of a claim under the CDA because they do not specify the bases and amounts of liability corresponding to the Government's withholding. The vouchers generally describe liability as "work not completed" and provide only the aggregate amount withheld. The estimate worksheets also do not further defendant's position, because the record indicates that RFP Nos. 25 and 26 were issued to plaintiff on or about January 19, 1994, and October 4, 1993, respectively. Since no other correspondence attached to Mr. Barry's declaration was dated prior to September 17, 1993, defendant's argument fails.

The only remaining item of record preceding Voucher No. 15, as contained in the appendix to defendant's brief, is a letter dated June 17, 1993, from Contracting Officer Moy to plaintiff. GSA denied plaintiff's June 14, 1993 request for the contract balance, explaining that no payment was due given "[t]he value of outstanding punch list items, credits for work deleted from the contract, anticipated credits for RFP # 23 and RFP # 24 and the accumulated cost of liquidated damages." This letter does not qualify as a valid claim because it provides several bases for liability, yet specifies only one aggregate damages figure. *See Placeway*, 920 F.2d at 906; *Contract Cleaning*, 811 F.2d at 592. Moreover, the letter provides only a vague description as to what the contracting officer deemed to have been the basis of the withholding. *See infra* at p. 759.

### 3. *Miscellaneous correspondence subsequent to Voucher No. 15*

■ Defendant alternatively argues that all of the documents attached to Mr. Barry's declaration taken together satisfy the requirements of the CDA. The court presumes that defendant relies on *Contract Cleaning*, which stands for the proposition that certain pieces of correspondence taken together may be construed as a claim under the CDA. 811 F.2d at 592; *cf. Sharman*, 2 F.3d at 1571 (questioning the propriety of combining two letters from contracting officer where one pertained to default judgment and one demanded specific sum of money).

To support GSA's retention of $197,981.00 of the contract balance, defendant relies on RFP Nos. 25 and 26, dated January 19, 1994, and October 4, 1993, respectively, which set

forth various proposed contract modifications. Plaintiff responded to RFP No. 25 on February 14, 1994, via a cost proposal, wherein it specifically rejected Item Nos. 7, 12, and 13, which sought credits for certain work deletions. In its proposal dated October 19, 1993, submitted in response to RFP No. 26, plaintiff rejected all proposed contract modifications, which again primarily involved credits for work deletions. According to plaintiff, the credits in RFP Nos. 25 and 26 were improper because the work to be deleted involved items that were never part of the original contract.

■ To qualify as a valid CDA claim, "a claim must seek payment of a sum certain as to which a dispute exists at the time of submission." *Dawco*, 930 F.2d at 878. The RFPs do not constitute a claim because such documents represent mere proposals by GSA for possible contract modifications. *See Sharman*, 2 F.3d at 1571 (holding that amount specified by contracting officer in demand letter was mere proposal which had not yet been rejected by contractor); *Dawco*, 930 F.2d at 878 (ruling that "[u]nilateral cost proposals ... do not, for purposes of the Act, satisfy the clear requirement that the request be in dispute") (citation omitted). Given that no dispute existed at the time the RFPs were issued, the court cannot construe the RFPs as representing a valid claim to the $197,981.00.

Even if this court evaluates the RFPs in conjunction with the June 17, 1993 letter, no claim exists under the CDA. The June 17 letter specifically stated that contract monies were withheld due to "credits for work deleted from the contract."[8] This is a vague description as to the basis of GSA's withholding, given that the contracting officer never identified the RFP or contract modifications at issue. The contracting officer certainly understood the import of specificity, as evidenced by the discussion in the June 17 letter concerning the "*anticipated credits* for RFP # 23 and RFP # 24." (Emphasis added.)

Moreover, even though the letter was not clear, the record indicates that when the contracting officer referred to "credits for work deleted," the contracting officer could not have been referring to RFP Nos. 25 and 26, because they were issued several months after the letter. Had the contracting officer contemplated these RFPs when mentioning the "credits for work deleted," he would have clarified that these credits were "anticipated," as he did with respect to RFP Nos. 23 and 24.

■ With respect to GSA's withholding of $15,750.00, defendant cites a series of letters concerning damage to a freight elevator, dated between October 15, 1993, and March 3, 1994. On December 3, 1993, plaintiff offered a credit of $3,000.00 for its share of the damages. Plaintiff derived this figure from the $21,000.00 repair estimate and the fact that seven parties used the elevator during the subject period. During argument plaintiff further stated that it offered the credit "in the interest of settlement" and that it never admitted to causing the damage. Tr. at 42.

Contracting Officer Halliburton rejected plaintiff's credit proposal on March 3, 1994. The letter specifically stated that "the Government believes that ... [plaintiff] should bear 75% of the costs of repair and replacement for th[e] elevator.... [Plaintiff's] acceptance of this amount ($15,750.00) will be the basis of the issuance of a credit RFP to ... [plaintiff]." This letter identifies both the basis of liability and specifies the amount of damages associated with such liability. *See Placeway*, 920 F.2d at 906; *Contract Cleaning*, 811 F.2d at 592. To qualify as a claim, though, the CDA also requires that "[a] contractor and the government contracting agency ... already be *in dispute* over the amount requested...." *Dawco*, 930 F.2d at 878 (emphasis in original).

Even interpreting *Dawco* restrictively to require that a dispute cannot exist under the CDA unless the asserted sum certain is

---

**8.** The text reads, in full:
The value of outstanding punch list items, credits for work deleted from the contract, anticipated credits for RFP # 23 and RFP # 24 and the accumulated cost of liquidated damages has been evaluated.... No additional payment ... is warranted at the present time based on the value of deductions assessed.

known, the court holds that the dispute requirement has been satisfied. *But see American Telephone and Telegraph Co. v. United States,* 32 Fed.Cl. 672, 676 (Fed.Cl.1995) (ruling that dispute requirement does not extend to sum certain so long as liability is contested). The correspondence between the parties from October 15, 1993, through March 3, 1994, indicates a dispute as to both liability and sum certain, *i.e.,* the $15,750.00 withheld by GSA.

By acknowledging the $21,000.00 repair cost estimate and offering only a $3,000.00 credit for the damage, plaintiff implicitly disputed the rendering of any amount of money in excess of $3,000.00. Thus, although the March 3, 1994 letter represents the first time plaintiff became aware that the Government intended to withhold $15,750.00, a dispute existed as to such sum as early as December 3, 1993. As a consequence, the March 3, 1994 letter qualifies as a valid government claim. The letter also serves as a final contracting officer's decision, even though the letter did not contain either the words "final decision" or the boilerplate language concerning a contractor's appeal rights. *See Placeway,* 920 F.2d at 907. Moreover, *Sharman* is not implicated because the letter issued more than two months before the original complaint was filed.

■ The June 27, 1994 letter from GSA to plaintiff concerning the missing exit light is the next piece of evidence supporting GSA's withholding. This letter, however, did not specify the amount that GSA intended to withhold for plaintiff's alleged failure to install the light. The letter simply requested that plaintiff complete the omitted work.

The June 17, 1993 letter also addressed the omitted work. Even viewing this letter in conjunction with the June 27, 1994 letter, no claim was perfected. The June 17, 1993 letter stated that GSA was withholding the entire contract balance. based, in part, on "[t]he value of outstanding punch list items." Although this letter specified, in general terms, certain bases of liability, it, as the

June 27, 1994 letter, failed to provide a breakdown of damages relevant to the omitted work setoff. The court therefore holds that the two letters cannot be construed to constitute a claim under the CDA. *See Placeway,* 920 F.2d at 906; *Contract Cleaning,* 811 F.2d at 592. Voucher No. 16 marks the first time plaintiff was apprised of the amount withheld for the omitted work. This voucher, however, does not provide this court with jurisdiction over the Government's set-offs since it issued after the complaint was filed.

■ Finally, defendant relies on the correspondence between the parties concerning certain paint deficiencies. Again, these letters did not stipulate that GSA intended to withhold money for the alleged deficiency, and no dollar figure was ascribed to the delinquency until this litigation. This correspondence does not constitute a valid CDA claim.

With the exception of the elevator claim, the assemblage of documents relied upon by defendant does not satisfy the requirements for a CDA claim. The court therefore holds that jurisdiction is present only with respect to the Government's elevator claim.[9]

4. *Plaintiff's claim under the CDA*

■ Defendant argues that although plaintiff submitted a "generic claim" on July 2, 1993, seeking the balance due under the contract, this claim is insufficient to challenge the $15,750.00 credit advanced by GSA with respect to the freight elevator. Def's Br. filed Dec. 12, 1994, at 13. Defendant further asserts that plaintiff has not satisfied the dispute requirement of the CDA with respect to the elevator issue.

Plaintiff is not required to submit a separate monetary claim concerning the elevator damage assessment before it can contest the matter in this court, because the elevator assessment is a government claim. *See Placeway,* 920 F.2d 903 (holding that jurisdiction existed as to government's setoff, even though contractor had not submitted claim specifically contesting government's

---

9. During argument plaintiff admitted liability as to the missing exit light, but reserved the issue of damages for trial. The court acknowledges this admission, but cannot act on the damages issue until the Government has satisfied the jurisdictional prerequisites of the CDA.

claim); *Cupey Bajo Nursing Home, Inc. v. United States*, 23 Cl.Ct. 406, 417 (1991) (holding that Government's demand for payment of monies is government, not contractor, claim and therefore contractor "was not required to file a certified claim for th[e disputed] amount before instituting suit"); *Cecile Indus., Inc. v. United States*, 18 Cl.Ct. 730, 732 (1989) (citing cases) (ruling that "a contractor may contest a government claim in the Claims Court without first filing a written claim with the CO [contracting officer]...."); *Mega Constr. Co. v. United States*, 14 Cl.Ct. 555, 557 (1988) (citing cases) (holding that once Government makes demand for money upon contractor in default, contractor may bring suit to contest default and to determine amount of damages).

Plaintiff filed a valid claim under the CDA on July 2, 1993, seeking the contract balance due.[10] The Government's $15,750.00 setoff for elevator damage explains, in part, why GSA refused to release the contract balance. Requiring plaintiff to submit an additional claim contesting the Government's claim would not advance any purpose germane to the CDA; instead, it would serve only to drag out the process pointlessly to the detriment of the contractor.

Moreover, the logical extension of defendant's argument is that plaintiff should have submitted a separate monetary claim to the contracting officer for each of the Government's claimed setoffs. Defendant, however, inexplicably focuses on only one setoff—the elevator. The court holds that plaintiff was not required to file a formal claim disputing GSA's asserted entitlement to $15,750.00 for freight elevator damages before it could contest the matter in court.

## CONCLUSION

Let there be no mistake about the import of this opinion. It has analyzed the facts and applied the law to determine whether the scheduled trial can comprehend all claims between the parties. Fed.R.Civ.P. 14 and the Rules of the Court of Federal Claims embody the precept that mandatory counterclaims should be adjudicated with the principal claims in the same proceeding. Indeed, Congress has deemed that contract claims and government counterclaims be tried together in the Court of Federal Claims. 28 U.S.C. §§ 1503, 2508 (1988). Litigation of related claims in one proceeding is a paean to judicial economy and conservation of the parties' resources. The decision today yields a contrary result. Defendant's counterclaims and setoffs admittedly directly relate to the same subject matter as plaintiff's complaint, but they will not be litigated at trial. Nor will they be barred. The Government may commence an action on them in another court.

This court would submit to torture rather than exercise jurisdiction over unwarranted subject matter. However, the analysis that was required to ascertain the permitted exercise of jurisdiction is tortuous, from a legal point of view, and protracts and adds to the costs of the proceedings, from a practical point of view. Surely, Congress did not intend that such exhaustive effort would be expended merely to ascertain the court's power to proceed on claims. The end result also fails the litmus test of common sense: In future cases, in order to avoid piecemeal litigation, the Government will be required to issue final decisions asserting setoffs before the date on which the contractor can deem a claim denied—just in case the contractor files suit. The avowed congressional objective in enacting the CDA to foster administrative resolution of claims is a casualty of slavish adherence to a patchwork of statutory, regulatory, and decisional law that now guides the trial court. The court awaits guidance from the Federal Circuit to sort out *Placeway*, *Sharman*, and *Dawco*. Only Congress can address the fundamental problem that the CDA has become a jurisdictional maze—atypically hard on the Government in this case and usually a minefield for the contractor. The real loser is the fisc. Heavily litigated jurisdictional requirements just make the cost of contracting with the Government higher.

---

**10.** Defendant does not take the position that the claim is invalid or that the contracting officer failed to issue a decision with respect to this claim. *See* 41 U.S.C. § 605(c)(5) (regarding deemed denials).

Accordingly, based on the foregoing, the court concludes that jurisdiction is present to entertain only the Government's elevator claim. The court lacks jurisdiction to hear the remaining government setoffs, including the liquidated damages claim.

**IT IS ORDERED,** as follows:

1. Plaintiff's motion for partial summary judgment with respect to Count 12 of the Amended Complaint is granted in the amount of $14,700.00. Because no just reason exists for delaying entry of judgment, RCFC 54(b), the Clerk of the Court shall enter judgment for plaintiff in the amount of $14,700.00, plus interest from July 6, 1993, pursuant to 41 U.S.C. § 611. Plaintiff's motion is otherwise denied.

2. Defendant's cross-motion is granted only to the extent that plaintiff is liable for failing to install the exit light and is otherwise denied.

3. Defendant shall file an amended answer asserting the elevator claim by February 28, 1995. Defendant's pending second amended answer shall be returned unfiled.